FRANK W. SANGER, Appellant, v. THOMAS HENRY FRENCH, Respondent.

157    213
d165    91

1. APPEAL — REVERSAL OF REFEREE UPON FACTS. In order to sustain in the Court of Appeals a reversal by a General Term of a decision of a referee upon the facts, it must appear that his findings are against the weight of evidence, or that the proofs so clearly preponderated in favor of a contrary result that it can be said with a reasonable degree of certainty that his conclusions were erroneous.

2. VERBAL AGREEMENT OF PARTNERSHIP FOR EXPLOITING PLAYS. The evidence upon the question of the existence and application of a verbal agreement of partnership between the plaintiff and defendant, who were members of a corporation conducting a theatre in New York city, for touring and exploiting through the country plays performed at that theatre and which were acquired or controlled by either of them, or by a firm of dealers in plays of which the defendant was a member,

*held* not to have warranted the reversal by the General Term, upon the facts, of a decision of a referee in favor of the plaintiff, finding the existence of the partnership agreement and that it covered a certain particular play.

3. STATUTE OF FRAUDS AS A DEFENSE. The Statute of Frauds is not available as a defense unless pleaded as such.

4. APPLICATION OF STATUTE TO PARTNERSHIP AGREEMENTS. It is doubtful whether the Statute of Frauds has any application to oral partnership agreements; and it certainly has none when the agreement has been wholly or partially executed.

5. PARTNERSHIP AT WILL. If the Statute of Frauds has any application to an oral partnership agreement, as an agreement not to be performed within one year, its only effect is to convert it into a partnership at will; and such a partnership exists until something is done to dissolve it.

6. ACTION FOR PARTNERSHIP ACCOUNTING. A partner is not compelled to bring an action for dissolution in order to obtain an accounting; and an accounting concerning the profits of a partnership transaction which has been executed may be obtained by an action brought for that purpose, although the defendant has excluded the plaintiff from participation in the execution of the transaction.

7. PARTIES TO ACTION. Where the plaintiff and the defendant, as individuals, are the only parties to the partnership agreement under which an accounting is sought, a secret or undisclosed arrangement between the defendant and a third person, as members of another firm, cannot affect the rights of the parties to the action, and such third person need not be made a party thereto.

*Sanger* v. *French,* 91 Hun, 599, reversed.

(Argued October 20, 1898; decided November 22, 1898.)

APPEAL from an order of the late General Term of the Supreme Court in the first judicial department, entered December 30, 1895, reversing a judgment in favor of plaintiff entered upon the report of Daniel G. Rollins, referee, and granting a new trial.

This was an action in equity; the relief demanded by the complaint was "that the plaintiff and defendant may be adjudged equal copartners in the ownership, production and management of the play 'Little Lord Fauntleroy,' and to be entitled to the profits arising from the production and management thereof equally, share and share alike," and that the defendant be required to account for such profits.

The facts, so far as material, are stated in the opinion.

*Almon Goodwin* and *Augustus H. Vanderpoel* for appellant. The court is authorized and required to review the facts in this case. (Const. art. 6, § 9 ; Code Civ. Pro., in force in 1895, § 1338; *Barnard* v. *Gantz,* 140 N. Y. 249, 253 ; *Baird* v. *Mayor, etc.,* 96 N. Y. 567.) The General Term had no ground to justify its reversal of the decision of the referee upon the facts. (*Barnard* v. *Gantz,* 140 N. Y. 249, 253 ; *Baird* v. *Mayor, etc.,* 96 N. Y. 567, 576, 578; *Aldridge* v. *Aldridge,* 120 N. Y. 614; *Devlin* v. *G. S. Bank,* 125 N. Y. 756; *Foster* v. *Bookwalter,* 152 N. Y. 166–168; *Ball* v. *Loomis,* 29 N. Y. 412, 414, 415 ; *Westerlo* v. *De Witt,* 36 N. Y. 340, 345 ; *Crane* v. *Baudouine,* 55 N. Y. 256, 264; *Roosa* v. *Smith,* 17 Hun, 138 ; *Shute* v. *Jones,* 78 Hun, 99, 101; *D. G. B. Co.* v. *Cowan,* 80 Hun, 392, 393 ; *Sayles* v. *De Graff,* 82 Hun, 73, 75 ; *Solomon* v. *C. F. Ins. Co.,* N. Y. L. J., May 6, 1898; *Woolsey* v. *Funke,* 121 N. Y. 87, 92; *Ins. Co.* v. *Dutcher,* 95 U. S. 269, 273 ; *Robbins* v. *Laswell,* 27 Ill. 363, 369 ; *Price's Heirs* v. *Evans,* 26 Mo. 30.) The agreement of April 25, 1887, was a valid agreement, based not only upon a good and valuable consideration in law, but also a large one in fact, and under it a half interest in "Little Lord Fauntleroy" passed to the plaintiff. Further than this, other large and valuable considerations were given by the plaintiff and accepted by the defendant upon the agreed transfer of that play to the firm of French & Sanger in July, 1888, sufficient to vest a half interest in the plaintiff independently of the contract of April 25, 1887. (*Coleman* v. *Eyre,* 45 N. Y. 38, 41; *Currie* v. *Misa,* L. R. [10 Ex.] 162 ; *Train* v. *Gold,* 5 Pick. 380, 385.) The matters in controversy were of equitable cognizance and the form of this action is correct. (*Watts* v. *Adler,* 130 N. Y. 646, 648 ; *Dyckman* v. *Valiente,* 42 N. Y. 549–564; Lindley on Part. 492 ; *Greason* v. *Keteltas,* 17 N. Y. 491; *Lewis* v. *Mott,* 36 N. Y. 395 ; *Baird* v. *Mayor, etc.,* 74 N. Y. 382.) The plaintiff was not compelled to bring an action for or to demand a dissolution of the partnership. (*Traphagen* v. *Burt,* 67 N. Y. 30, 36 ; 17 Am. & Eng. Ency. of Law, art. Part. 1275 ; Lindley

on Part. *465, *478, *492, *494, *495 ; *Fairthorne* v. *Weston,* 3 Hare, 386, 391 ; *Richards* v. *Davies,* 2 R. & M. 347 ; *Somerby* v. *Buntin,* 118 Mass. 279 ; *Leavitt* v. *Windsor Land, etc., Co.,* 54 Fed. Rep. 439 ; *Denver* v. *Roane,* 90 U. S. 355, 357.) It is immaterial whether the agreement of April 25, 1887, was intended to or did constitute a partnership for years or a partnership at will. In either case the plaintiff's right to the relief prayed for and granted by the judgment is not barred by the Statute of Frauds. (*Crane* v. *Powell,* 139 N. Y. 379, 383, 389 ; *Wells* v. *Monihan,* 129 N. Y. 161, 164 ; *Hamer* v. *Sidway,* 124 N. Y. 538, 548 ; *Porter* v. *Wormser,* 94 N. Y. 431, 450 ; *Coleman* v. *Eyre,* 45 N. Y. 38, 40, 41 ; *Wahl* v. *Barnum,* 116 N. Y. 87 ; *Smith* v. *Tarlton,* 2 Barb. Ch. 336 ; *Bissell* v. *Harrington,* 18 Hun, 81, 86 ; *Remington* v. *Palmer,* 62 N. Y. 31, 34 ; *Ryan* v. *Dox,* 34 N. Y. 311, 312 ; *Levy* v. *Brush,* 45 N. Y. 589 ; *Traphagen* v. *Burt,* 67 N. Y. 30 ; *Wheeler* v. *Reynolds,* 66 N. Y. 227, 236 ; *Johnson* v. *Brooks,* 93 N. Y. 337, 343 ; *Jones* v. *Duff,* 47 Hun, 170 ; *Coudert* v. *Cohn,* 118 N. Y. 309 ; *W. C. & M. Co.* v. *Holbrook,* 118 N. Y. 586.) The effect of the Statute of Frauds was to make the agreement of April 25, 1887, a partnership at will, but this does not affect plaintiff's interest in "Fauntleroy." (*Wahl* v. *Barnum,* 116 N. Y. 87, 96, 97 ; *Smith* v. *Tarlton,* 2 Barb. Ch. 336 ; Lindley on Part. 571 ; *Roby* v. *A. C. Ins. Co.,* 120 N. Y. 510, 515.) The agreement of April 25, 1887, was not uncertain in its terms or incapable of enforcement in a court of equity. (*Ins. Co.* v. *Dutcher,* 95 U. S. 269, 273 ; *Woolsey* v. *Funke,* 121 N. Y. 87, 92 ; *Kennedy* v. *Porter,* 109 N. Y. 526, 547.) Nothing has ever been said or done by the plaintiff working an equitable estoppel against his claim or inconsistent therewith. (*Brown* v. *Bowen,* 30 N. Y. 519, 541 ; *Todd* v. *Weber,* 95 N. Y. 181, 192.) Samuel French was not a necessary or proper party to this action. (Lindley on Part. *460 ; 17 Am. & Eng. Ency. of Law, 933 ; *Burnett* v. *Snyder,* 76 N. Y. 349 ; 81 N. Y. 550, 555 ; Barb. on Parties to Actions, *149 ; *Hurlbut* v. *Post,* 1 Bosw. 28 ; *N. Y. D. Co.* v. *Treadwell,* 19 Wend. 525 ; *Clarkson* v. *Carter,* 3 Cow. 84 ; *Clark* v.

*Miller,* 4 Wend. 628; *Mitchell* v. *Dale,* 2 Har. & Gill, 159; *Page* v. *Brant,* 18 Ill. 37.) The share of the profits from "Little Lord Fauntleroy" to which the plaintiff is entitled is one-half thereof, and not one-quarter, as now contended by the defendant. (*Ins. Co.* v. *Dutcher,* 95 U. S. 269, 273; *Woolsey* v. *Funke,* 121 N. Y. 87, 92; *Kennedy* v. *Porter,* 109 N. Y. 526, 547; *Johnson* v. *Hathorn,* 2 Abb. Ct. App. Dec. 465, 468; *Todd* v. *Weber,* 95 N. Y. 187, 191; *M. & T. Bank* v. *Hazard,* 30 N. Y. 226, 230; *White* v. *Hoyt,* 73 N. Y. 505, 511.) The judgment is correct in form. (*Traphagen* v. *Burt,* 69 N. Y. 30; *Haffey* v. *Lynch,* 143 N. Y. 241–248; *Dammert* v. *Osborn,* 140 N. Y. 30, 34.) The judgment works no injustice and no hardship to the defendant. It does not even give to the plaintiff his fair share of the profits in the production of "Fauntleroy." (*Benson* v. *Heathorne,* 1 Y. & C. C. C. 226.) None of defendant's exceptions to the admission or rejection of evidence are well taken. (*Matter of N. Y. C. & H. R. R. R. Co.,* 90 N. Y. 342, 347; Taylor on Ev. § 316; *Platner* v. *Platner,* 78 N. Y. 90, 95; *Eighmy* v. *People,* 79 N. Y. 546, 557, 558; *Lund* v. *Tyngsborough,* 9 Cush. 36; Greenl. on Ev. §§ 108, 109; Chase's Stephen's on Ev. art. 8.)

*A. J. Dittenhoefer* and *David Gerber* for respondent. The reversal having been made upon the law as well as the facts, the appellant, upon an appeal to this court from an order granting a new trial, takes the risk of every exception appearing upon the record, and the respondent may sustain the order by showing any legal error upon the part of the trial court. (*Foster* v. *Bookwalter,* 152 N. Y. 166–168.) On the pleadings and testimony the referee was, in no event, justified in awarding to the plaintiff the defendant's entire share of profits of "Fauntleroy." (*Coghlan* v. *Stetson,* 19 Fed. Rep. 729; *Russell* v. *Allerton,* 108 N. Y. 288; *Smith* v. *Molleson,* 148 N. Y. 248; *Burnett* v. *Snyder,* 76 N. Y. 344–351.) The alleged option to purchase agreement cannot be enforced in this action without violating the rule *secundum allegata et*

28

*probata.* (*Arnold* v. *Angell*, 62 N. Y. 508.) An agreement granting an option to purchase, as found by the referee, amounts merely to an agreement to make an agreement. It gave plaintiff the right to purchase whenever the defendant was willing to sell and at a price to be agreed on, but did not impose on defendant the obligation to sell whenever plaintiff desired to buy. (*M. E. Co.* v. *Ward*, 24 Abb. N. C. 393; *Garcia* v. *Callendar*, 53 Hun, 12; *M. E. Co.* v. *Ewing*, 24 Abb. N. C. 419; *P. B. Club* v. *Hallman*, 8 Penn. Co. Ct. Rep. 57; *Milliman* v. *Huntington*, 22 N. Y. Supp. 987; 68 Hun, 258; *C. T. Co.* v. *Smith*, 47 Hun, 494; *May* v. *Thompson*, L. R. [20 Ch. Div.] 705; *Bertel* v. *Neveux*, 39 L. T. Rep. [N. S.] 257; *Kayser* v. *Arnold*, 16 N. Y. S. R. 105.) The agreement found by the referee is unenforcible, for the reason that it introduced, without Samuel French's consent, a new member into the firm of Samuel French & Son. (*Burnett* v. *Snyder*, 76 N. Y. 344.) The defendant could not dispose of a play, or exploit it, without communicating with Samuel French; and whenever he was in doubt about Samuel's wishes, he cabled or wrote him. Samuel French is a necessary party defendant, without whose presence no final decree can be made. (17 Am. & Eng. Ency. of Law, 928, 930; *Metcalf* v. *Officer*, 2 Fed. Rep. 640–642; *C. N. Bank* v. *Seligman*, 64 Hun, 615; *Duane* v. *Paige*, 82 Hun, 139–149; *C. T. Co.* v. *Noble*, 10 Mass. 328; *Mayer* v. *Frankfeld*, 85 Hun, 214–216.) Whether the contract be considered as giving the plaintiff the right to purchase an interest in the plays or assets of Samuel French & Son or as creating a sub-partnership with defendant, an action for an accounting does not lie. (*Burnett* v. *Snyder*, 76 N. Y. 351.) An agreement to form a partnership is incapable of specific enforcement, for the same reason that a master cannot be compelled to permit a servant to work for him. (*Davis* v. *Key*, 123 U. S. 79; *Goldsmith* v. *Sachs*, 17 Fed. Rep. 716; *Scott* v. *Rayment*, L. R. [7 Eq.] 112; *Vance* v. *Blair*, 18 Ohio, 532; 51 Am. Dec. 46; *Hill* v. *Palmer*, 43 Am. Rep. 704; *Bagley* v. *Smith*, 10 N. Y. 489; *Roberts* v. *Derby*, 68 Hun, 299–303; *Johnson Co.* v. *Hunt*, 21 N. Y.

Supp. 314; *Lochman* v. *Meehan*, 21 N. Y. Supp. 389; *Dudley* v. *Congregation, etc.*, 138 N. Y. 451.) If the option agreement was for no fixed term, it was terminable at defendant's will, and if it was to last for twenty-one years, it is void under the Statute of Frauds. (*Tompkins* v. *Raphael*, 17 Wkly. Rep. 413; *Williams* v. *Jones*, 1 Barn. & C. 108; *Morris* v. *Peckham*, 51 Conn. 128; *Hartwell* v. *Young*, 67 Hun, 472; *Ridgway* v. *Grace*, 21 N. Y. Supp. 934; 2 Misc. Rep. 293.) An action for an accounting so far only as relates to a single asset of a partnership cannot be maintained. (*Williams* v. *Lindblom*, 68 Hun, 173; *Arnold* v. *Arnold*, 90 N. Y. 580; *Blatchford* v. *Blatchford*, 127 Mass. 510.) An action for an accounting merely cannot be maintained where no fiduciary relation exists. (*Abbey* v. *Wheeler*, 85 Hun, 227–230; *McCullough* v. *Pence*, 85 Hun, 271.) The referee had no power to award a money judgment until after "Fauntleroy" was sold and the interests of the parties in said play were finally disposed of. (17 Am. & Eng. Ency. of Law, 1293; *Filbrun* v. *Ivers*, 92 Mo. 388; *McCall* v. *Moschcowitz*, 10 Civ. Pro. Rep. 107, 110, 141.) Plaintiff failed to sustain the burden of proof. (*Russell* v. *Allerton*, 108 N. Y. 288; *Rubino* v. *Scott*, 118 N. Y. 662; *Coghlan* v. *Stetson*, 19 Fed. Rep. 729; *Smith* v. *Molleson*, 148 N. Y. 248; *Adams* v. *Morrison*, 113 N. Y. 152–155; *Kelly* v. *Devlin*, 15 J. & S. 555; 18 Wkly. Dig. 337.) The referee erred in admitting evidence of contracts and transactions between these parties anterior to the contract sued on. (*Jackson* v. *Smith*, 7 Cow. 717, 718; *Dwight* v. *Badgley*, 60 Hun, 144.)

O'Brien, J. The questions litigated in this action were questions of fact. The plaintiff was the manager of a theatre. The defendant was the junior member of a firm composed of himself and his father, known as the firm of Samuel French & Son, having an office or place of business both in New York and London. The defendant represented his firm in this country, and his father had charge of the firm business in Europe. The business of the firm was the purchase and

leasing or subletting of plays and dramas to theatres and theatrical managers in the United States and Canada, subject to the payment of royalties to the authors or owners thereof. The firm was also engaged in the publication and sale of printed plays and dramatic works, and in the sale of theatrical supplies.

In the month of April, 1887, the plaintiff and defendant conceived the project of building the Broadway Theatre in New York, in conjunction with another person, who was to furnish a portion of the necessary capital. It was a part of the scheme that the business was not to be confined to the theatre, properly so called, but that the associates in the enterprise should have the first option to take such plays as should be suitable for the new theatre, whether procured or controlled by the plaintiff or the defendant, or the defendant's said firm, and that such plays when suitable should not only be produced at the theatre, but should also, taking advantage of the reputation and prestige acquired by the successful production of the same at the Broadway Theatre in New York, afterwards, in theatrical language, be " toured " or " exploited " in the country throughout the United States and Canada for their individual profit, to be shared equally between the associates.

A contract in writing, embracing substantially this scheme, was entered into between the parties to this action and one Bailey, but it was subsequently canceled at the request of the latter on account of ill-health, and at his suggestion another man was substituted in his place    It seems that this man did not possess the necessary financial resources, and for this and other reasons this written agreement was also canceled. A third party who owned the land upon which the Broadway Theatre now stands was willing to embark in the enterprise and furnish half the capital necessary for building the theatre, provided a corporation should be formed for that purpose. He was not willing, however, to go any farther than to furnish half the capital for the project, and that on condition that the company to be formed leased from him

the land for the erection of the theatre at a rental of
$18,000 per year, for which, not only the corporation, but
the parties to this action, were to become personally responsi-
ble. The new associate was not willing to engage in the busi-
ness of touring or exploiting plays in the country for profit, or
to participate in the theatre business, otherwise than as a stock-
holder in the new theatre. The plaintiff and defendant
accepted his proposition, the corporation was formed, a long
lease of the land, with provisions for renewals, was made in
such form that the parties to this action became personally
responsible for the rent, and the theatre was built at the cost
of about $320,000, of which the plaintiff and defendant fur-
nished one-half in equal shares, and the lessor and owner of
the land the other half.

The plaintiff claims and alleges that when this third associ-
ate came into the project, but declined to become in any way
a partner in the theatre business with any one, that then a ver-
bal agreement was made between the plaintiff and defendant
alone on the lines of the Bailey contract already referred to,
whereby they were to be and become equal partners in touring
and exploiting through the country such plays as had obtained
reputation at the Broadway Theatre, and which were owned or
controlled by either of them, or by the defendant's firm, and
to this end a firm composed of the plaintiff and defendant, and
operating outside the corporation, should have the first option
to take or purchase such plays as either of them owned or con-
trolled. It seems that the word " purchase," when applied to
a play, means that a party has acquired from the author or
owner the right to use it, upon payment of a stipulated royalty.

The principal question in this case was whether the verbal
agreement of partnership claimed by the plaintiff, under which
he was entitled to share equally with the defendant in the profits
of touring and exploiting plays, had ever in fact been made as
alleged. All the issues in the case, including the accounting as
well as the existence of the partnership in any form, were
referred to a referee to hear and determine, and he found on all
these issues in favor of the plaintiff. The important finding in

the case is that which sustains the plaintiff's allegation that there was a partnership agreement. After finding in detail the scope and purpose of the original scheme, the written agreement with Bailey and his substitute, the cancellation of the respective agreements between them and the parties to this action and the cause, as hereinbefore stated, all of which preceded and led up to what the plaintiff claimed to be the final agreement, the referee finds substantially as follows: On the 25th of April, 1887, the plaintiff and defendant, with Young, who was the person substituted at the suggestion of Bailey in his place, with their counsel went to the office of the counsel for the landowner who was to lease the land for the purpose of the theatre, and the latter, on being informed that Bailey had withdrawn from the enterprise, objected to making the lease to the new firm, but offered himself to furnish a portion of the money for carrying out the project, providing a corporation could be formed for that purpose. This proposition, however, had reference only to the building and managing of the new theatre and did not include any business of touring and exploiting plays outside the theatre. The negotiations having thus assumed a new phase, the plaintiff and defendant retired to an adjoining room to consult between themselves, and the situation was fully discussed, and the finding states that it was then and there agreed that they would acccept the proposition of the landowner and form a corporation to build and own the theatre on the terms suggested by him, including the personal liability of plaintiff and defendant jointly for the ground rent, and their obligation to furnish each one-quarter of the capital for the enterprise. It is also found that the parties to this action agreed to become equal partners in the business of exploiting plays in the country after exhibition at the new theatre, and that the firm of French & Sanger, thus formed, should to that end have the first option to take any and all plays owned or controlled by either member of the firm which should be suitable for the new theatre for the purpose of producing them at the theatre and then exploiting them throughout the United States and Canada, including the

plays owned and controlled by defendant's firm of Samuel French & Son, which plays he in fact controlled, since he was the managing representative of that firm in this country.

The Broadway Theatre was completed and opened on the 3d day of March, 1888, by a corporation formed under the agreement already mentioned. The plaintiff became the president and general manager, and the defendant the treasurer. In the month of June, thereafter, the defendant's firm of Samuel French & Son purchased or acquired from Mrs. Frances Hodgson Burnett the American rights to her play entitled "Little Lord Fauntleroy." This transaction took place in London where Mrs. Burnett, the authoress, then resided, and where the defendant also temporarily was. The agreement was in writing, and in consideration of the stipulated royalty, a part of which was advanced by the defendant or his firm, the right to produce the play in this country and in Canada was acquired. On the return of the defendant from Europe, about July 1st, 1888, he and the plaintiff agreed that the new play thus acquired was suitable for and should be produced at the Broadway Theatre, and toured through the country under the agreement above mentioned, as is claimed by the plaintiff. The play was produced first at Boston and then at the new theatre in New York, and subsequently exploited through the country with great financial success.

It is the net profits of this play that constitute the subject-matter of this action. All these profits have come to the hands of the defendant, and the plaintiff claims that he is entitled to a share of them as a partner under the general arrangement of April 25th, 1887, and the referee found that the claim was well founded. After deciding the disputed question of fact he proceeded to state the account of these profits and to adjust the respective rights of the parties. On the defendant's statement of the account, after deducting all expenses, it appeared that the net profits of the play, not including Boston or New York, exceeded $120,000, and he directed judgment in favor of the plaintiff for one-half of such net profits, and judgment was entered accordingly.

⸱ The learned General Term has reversed this judgment on
the law and the facts, and granted a new trial, and from that
order and judgment the plaintiff has appealed to this court.
The action was commenced nearly ten years ago, and the
appeal was decided before the present Constitution and Code
went into effect.   It is, therefore, a case in which we are
required to review the conclusions of the court below upon
the facts under section 1338 of the Code, existing at the time
the decision was made.   The learned court below had power,
and it was its duty, to review the facts found by the referee,
but the scope and nature of the review in such cases are limited
and qualified by a principle which is now well settled.

A court on appeal cannot set aside the findings of the trial
court merely because they are of opinion that, upon the record
before them they would feel constrained to find the fact the
other way.   It must appear judicially from the record that
the findings are against the weight and preponderance of proof
so plainly that it can be held that the trial court or referee
could not reasonably have arrived at the conclusion expressed
in the decision.   In order, therefore, to sustain in this court a
reversal of the referee upon the facts, it must appear that his
findings are against the weight of evidence, or that the proofs
so clearly preponderated in favor of a contrary result that it
can be said with a reasonable degree of certainty that his con-
clusions were erroneous.   (*Foster* v. *Bookwalter*, 152 N. Y.
166–168; *Barnard* v. *Gantz*, 140 N. Y. 249; *Devlin* v.
*Greenwich Savings Bank*, 125 N. Y. 756; *Aldridge* v.
*Aldridge*, 120 N. Y. 614; *Baird* v. *Mayor, etc.*, 96 N. Y.
567.)

On the main point in issue the plaintiff's testimony was to
the effect that the partnership agreement was made as found
by the referee.   The defendant denied it, and hence the ref-
eree had to determine which of the witnesses told the truth.
He determined that question in favor of the plaintiff, not only
from the testimony of other witnesses, but from the mass of
facts and circumstances, letters and documents appearing in
the case, all pointing, as he held, in that direction.   The record

contains over eleven hundred printed pages, which we have examined with considerable care, and as we have arrived at the conclusion that the referee properly disposed of the case, and that the learned court below was not warranted in reversing his conclusion, it is perhaps due to the magnitude and importance of the case, to the parties themselves and to the learned court below, that we should state in as brief a manner as possible, the reasons that have led us to this result. In order to avoid prolixity we will deal only with a few leading facts that are admitted or so clearly established that we regard them as out of the range of controversy in this court, omitting many minor facts and details that have some direct or remote bearing on the issue of fact which the case presented.

(1) It is quite clear that these parties, in all the negotiations which culminated on the 25th of April, 1887, contemplated some such arrangement as that found by the referee. This is made plain by the provisions of the written agreement, first with Bailey and subsequently with Young, since these two papers contain substantially such an arrangement between the parties as that found by the referee. This fact suggests the inquiry whether upon the introduction of a new party into the general scheme, the plaintiff and defendant, during the interview of half an hour or less in the private room of the office where they were, abandoned or ignored an important part of the original project which had long been under consideration and which had been twice reduced to writing. The plaintiff says that the understanding was that it was still to be a part of the scheme, with two partners instead of three, the defendant and himself constituting the firm and sharing equally in the profits. His statement is thus made quite reasonable and probable by all the acts of the parties preceding the arrangement which he says was actually made.

The defendant, in denying the partnership agreement testified to by the plaintiff, evidently thought it necessary to also deny that the same or any similar agreement had been made previously with either of the two parties who successively

contemplated joining with them in the enterprise, but who dropped out for the reasons stated, and so he denied that any such arrangement had ever been contemplated, but the subsequent production of the two written agreements satisfied him that he was, at least, mistaken. He then claimed that the provision with respect to the exploiting of plays in the country, outside the regular business of the new theatre, had been inserted without his knowledge, although it appeared to have been interlined in the handwriting of his own counsel. The conduct of the parties on and prior to the 25th of April, with reference to the question that was in dispute, was entitled to great weight with the referee in ascertaining what the truth was with respect to the arrangement sworn to by the plaintiff and denied by the defendant. It seems to us that these acts of the parties tended very decidedly to corroborate the plaintiff's version of the transaction.

(2) The conduct of the parties subsequent to April 25th is equally significant, since it plainly appears that the arrangement which the plaintiff claims was then made with the defendant was acted upon and, at least to some extent, carried out. We find these parties subsequent to that date actually engaged in procuring and exploiting plays, other than the one now in controversy, dividing the net profits between themselves and using the firm name of French & Sanger in the transaction of the business. This conceded fact had an important bearing upon the issue of fact in the case, since it is not very clear why there should be a partnership as to these several plays, and no partnership with respect to the one now under consideration. The referee had a right to consider this circumstance as bearing upon the credibility of the parties, and it is quite evident that he did.

(3) It clearly appears that after the right to use the play of " Little Lord Fauntleroy " had been acquired, written contracts in the name of the firm were made with actors who were to assist in its production, and for the printing or some part of it. These were acts tending to prove a partnership and to corroborate the plaintiff's testimony. It is true that they were

drawn by the plaintiff, or under his direction, but it is quite inconceivable that he was then manufacturing testimony for a future litigation, or that the defendant was ignorant of what was being done. It was a fact which the referee had the right to consider, with all the explanations on the part of the defendant, since it had an important bearing upon the principal fact in issue, namely, the existence of any partnership agreement whatever.

(4) The plaintiff produced several witnesses who testified to the defendant's admissions or declarations to them or in their presence, in substance to the effect that the parties were partners in the play of " Little Lord Fauntleroy." While this class of proof was subject to explanations and contradictions on the part of the defendant, it was a feature of considerable importance in the case, and it was for the referee to decide how far and to what extent it sustained the plaintiff's version of the transaction, or impeached that of the defendant. The value of such testimony must always depend very largely upon the character of the witnesses and the apparent candor and honesty with which the testimony is given. The trial court, and not the appellate tribunal, is generally the place where the real weight and force of such testimony must be determined.

(5) There is another circumstance in the case that tends to throw much light upon the main fact in controversy. That fact, of course, was at every stage of the inquiry whether the alleged·agreement of April 25th, 1887, concerning the partnership testified to by the plaintiff, had ever been made. About the 6th of July, 1888, after defendant's return from Europe, the plaintiff and defendant were busily engaged in preparing to produce the play in question, but it was found that they had made prior arrangements to produce another play, in the profits of which it is conceded that they were jointly interested, known as " Mr. Barnes of New York." It became necessary to arrange, ·if possible, for a postponement of that play in order to produce the play in question at the time stipulated in the contract with the owner, Mrs. Burnett. Accordingly they succeeded in making an arrangement with the owner of " Mr. Barnes of

New York" to postpone that play for the one in question, on the condition that they should pay a forfeit of $3,000 in case they failed to produce it before the 18th of February following. This arrangement for the postponement of that play was reduced to writing and signed by the owner and both of the parties to this action. Why the plaintiff should incur such obligations in postponing a play in which he was jointly interested in order to produce one in which he had no interest at all as a partner, is somewhat difficult to perceive, whereas, upon the assumption that he was interested in both alike, his conduct is explicable. Subsequently, and while the parties were arranging for the production of the play in question, the plaintiff's interest in it was the subject of conversation between them, in which the defendant told the plaintiff that the play had cost a great deal of money, without, however, mentioning the amount. The conversation ended in a request by the defendant that the plaintiff make some proposition for a reduction of his interest, and after further talk the plaintiff offered to waive his claim to the profits of the play in Boston and New York. The defendant, without accepting the proposition, closed the conversation by saying that the whole matter might be left to his father when he arrived from Europe, and that, as he was a fair man, he would do what was right about it. It is true that the defendant denied this conversation, but the referee evidently accepted the plaintiff's version of it, since he took the plaintiff at his word and refused to require the defendant to account for the large profits of the play in the two cities mentioned. What subsequently occurred goes far to support the views of the referee in this respect. It appears that the defendant's father and partner, on the 18th of October following, having just arrived from Europe, had an interview with the plaintiff concerning his interest in the play. The father then told the plaintiff that the play belonged to him individually and not to the defendant or to the firm composed of father and son. The defendant himself subsequently confirmed this statement. Of course, if this was the truth, the play did not come within the terms of the

arrangement testified to by the plaintiff as having been made on the 25th of April, and for some time thereafter the plaintiff, by his acts and words, seemed to have accepted the statement as true and to have acquiesced in the claim that the play did not come within the arrangement under which he claims he was to have an equal interest. But the statement was not true as subsequently appeared when the plaintiff obtained access to the written agreement made in London with Mrs. Burnett. That disclosed the fact beyond all doubt that the American rights to the play had been obtained by the firm of which the defendant was the managing representative in this country and hence came within the terms of the arrangement of April 25th, to which the plaintiff testified. The conduct of the defendant and his father with respect to the scope and nature of the agreement under which the right to produce the play had been procured naturally suggested this inquiry which is quite pertinent to the case. If it were true that the plaintiff had then made claim to share in the profits of the play as a partner, when there was no basis in truth for such a claim, then, certainly, the defendant and his father knew it, and it was not necessary to invent a falsehood to meet it. They could and naturally would have met the claim by a prompt denial that any such arrangement had been made as the plaintiff now claims, and as he then claimed in some form. Intelligent business men, such as the defendant and his father certainly are, do not, as a general thing, rely upon a falsehood as an excuse for not carrying out a contract which they never made, when they have a better excuse in the truth. The fact that under such circumstances the defendant met the plaintiff's claim by an excuse that had no basis in truth might well have created a doubt in the mind of the referee as to the integrity of his defense.

It is proper now to notice the leading arguments in behalf of the defendant upon the question of fact involved in the case. They evidently made a strong impression upon the learned court below, although rejected by the referee.

I. While the defendant was in London negotiating for the

play in question, the plaintiff, on the 8th of June, 1888, addressed a letter to him in which, after referring to other matters, not important to notice, this inquiry is made : "What arrangement have you made regarding Little Lord Fauntleroy? And if we produce it at the Broadway do I get a chance for a bit of it? If this is an impertinent question you need not answer it." The question was not answered, and it is urged by the learned counsel for the defendant with great persistence, throughout the case, that this paragraph amounts to an admission on the part of the plaintiff that the alleged agreement of April 25th, 1887, was never made. It must be borne in mind that when the plaintiff wrote this letter he had no knowledge of the terms or conditions upon which the play had been obtained, or the party to whom the right to use it had been transferred. This is shown by the question itself. If the defendant or his firm had procured it as agents for the owner, or if the defendant's father individually had acquired it, as was subsequently asserted, then it would not come within the arrangement which the plaintiff claims was made on the 25th of April, and plaintiff would have no interest in the profits.

The referee construed this letter as an inquiry by the plaintiff concerning the nature of the agreement under which the defendant and his father had procured the right to use the play here. Whether the plaintiff, upon his own theory, would be entitled to share in the profits depended entirely upon the fact that the defendant or his father's firm had "purchased" it, within the meaning of that term, as applied to such transactions. It was for the purpose of getting light on that point that the inquiry was made, according to the view that the referee took of the case. This construction is certainly quite as reasonable and probable as the one urged by the defendant, and, under all the circumstances, it would be quite impossible for any appellate court to say that in this respect the referee committed an error.

II. It appears that the plaintiff and the defendant were sued as partners upon one of the contracts made by them with an actress who had been engaged to participate in the play.

The complaint in the action alleged a partnership, and the answer, which was verified by both defendants, denied the allegation. But it was shown that the defendant had retained the attorneys to interpose the defense, and that the pleading drawn by them was taken by a clerk, who was also a notary, to the plaintiff while ill at his house, and upon being assured that the defendant had signed it concluded that it was all right, and he then signed the verification without appreciating the real scope and effect of the denial. How far the plaintiff's signature to that paper under such circumstances was to be considered as a contradiction of his version of what took place in the private room on the 25th of April was a question for the referee. He arrived at the conclusion from all the circumstances attending the signature that it did not impeach his testimony in this case, and it was not, we think, open for an appellate court upon review of his decision to say that he committed an error in that respect.

III. It is urged by the learned counsel for the defendant that the agreement of April 25th, as claimed by the plaintiff, is so absurd and unconscionable that it cannot be imputed to any reasonable or prudent man. This assertion will not bear a very close examination. It is no more improbable that there was an agreement to divide the profits of this play than it would be to suppose that there was a like agreement to share the profits of the other plays mentioned, in which such an arrangement not only existed but was carried out. Whether an agreement is wise or unwise is not always to be determined by the results, but by the lights which the parties have when they enter into it. On the 25th of April, 1887, it was not known and could not be foreseen that the play in question could be procured at all. Much less could the defendant have anticipated the phenomenal financial success that attended its production. It is only by a process of looking backward at a series of fortunate events that could not be foreseen when the alleged partnership agreement was made that any color can be given to the assertion that the agreement imputed to the defendant was so recklessly imprudent as to be incredible.

And even then it is difficult to see what ground there is for imputing to the defendant any lack of good judgment or business capacity in making the agreement found by the referee as he has interpreted and enforced it. Perhaps this agreement will be better tested by looking at the benefits which the defendant derived from the contract, even under the decision of the referee. He or his firm got all the profits of the play in Boston and New York, amounting it is said to over $30,000, since the referee refused to relieve the plaintiff from his offer to waive any claim to this part of the fund. This certainly was a most favorable ruling for the defendant. He received $10,000 more in percentages on the collection of the royalties under the contract with Mrs. Burnett which he was doubtless entitled to. Under the judgment of the referee he is allowed to retain over $60,000 more, representing one-half the net profits of exploiting the play in the country, outside New York and Boston. A contract that has yielded over $100,000 in cash to the defendant, or his firm, over and above all expenses, besides one-quarter of the net profits of the Broadway Theatre, cannot very well be called a wild or imprudent business venture. The net profits derived from exploiting the play in the country, outside the two cities named, were over $120,000, and the referee has awarded half that sum to the plaintiff.

The contention that this result deprives the defendant of every dollar of the profits of the play is equally unfounded. That argument is based upon the fact that, under his partnership with his father, he is entitled to only half the profits of that business, and it is assumed that the $60,000 which he receives under the judgment must go to his father. How the defendant and his father will divide between themselves, we cannot know, and it is not very material. It is quite clear, however, that the defendant had power to make the agreement of April 25th, and to use the plays which his firm owned or controlled in carrying it out, and if it was made, his firm, as such, would be entitled, not to all, but to half the net profits.

IV. The defendant also produced witnesses who testified to

the plaintiff's admissions or declarations to the effect that he had no interest in the play outside the Broadway Theatre, and proof was given of various acts of the plaintiff, such as allowing the defendant to receive and retain the whole proceeds of the business, which it is claimed are inconsistent with the existence of the partnership agreement. It is quite significant that these declarations and acts were after the 18th of October, 1888, when the plaintiff was led to believe by the statements of the defendant and his father that the play was acquired in such a way that he was not entitled to share in the profits. After that date the plaintiff's conduct for a time would indicate that he had abandoned all claim to any interest in the play, but on discovery of the contract with Mrs. Burnett, the claim was revived and pressed until the commencement of this action.

It is said that the circumstance that the alleged agreement of April 25th was not reduced to writing, when it appears that all the other partnership transactions were, goes far to discredit the plaintiff. But it is not true that there was any written partnership agreement concerning the other plays referred to where the profits were actually divided. In each case there was a receipt by the plaintiff to the defendant for a specific sum of money stated to be in full of his half of the profits in a designated play. The same written evidence of the partnership would doubtless be forthcoming in respect to the play in question, had there been an actual division of profits as there was in the cases referred to. There were some other facts and circumstances urged on both sides, as bearing on the disputed fact, but it is not necessary to consider them. It is quite sufficient to say that if they were all presented and set off, one against the other, the great weight and preponderance of proof would not be in the defendant's favor.

From this review we are convinced that the findings of the referee were not so decidedly against the weight of evidence as to warrant the court in reversing his conclusions. It is evident from his opinion, which appears in the record, that the case was carefully considered. It was his duty to weigh the

30

evidence, to determine the credibility of witnesses, to give construction to various letters and documents, acts and declarations of the parties, and when, through these processes, facts are once determined with reasonable fairness and regard for the evidence, they must, under our system of jurisprudence, be deemed to be settled for all purposes of the litigation.

The order of the court below states that the reversal was upon the law and the facts, but in the opinion no question of law is discussed or even mentioned. It is, nevertheless, true, as the learned counsel for the defendant contends, that he is entitled to sustain the reversal in this case upon any question of law disclosed by the record. This renders it necessary to notice some legal propositions that appear in the briefs of counsel and were discussed at the argument. These questions are presented by exceptions that have been carefully considered. Many of them relate to the form of the action, while others were taken to rulings upon the trial under which evidence was admitted or excluded.

The verbal agreement of partnership found by the referee was valid. It cannot be attacked for want of consideration, or as lacking in definiteness and certainty. It was carried out by the parties, though in the end the defendant assumed the entire management and excluded the plaintiff from sharing in the benefits. The objection that the agreement was void under the Statute of Frauds, as one not to be performed within one year, is not well taken. No such defense was pleaded. (*Crane* v. *Powell*, 139 N. Y. 379 ; *Matthews* v. *Matthews*, 154 N. Y. 288.)

It is at least quite doubtful whether the Statute of Frauds has any application whatever to oral partnership agreements. (*Coleman* v. *Eyre*, 45 N. Y. 38; *Wahl* v. *Barnum*, 116 N. Y. 87; *Traphagen* v. *Burt*, 67 N. Y. 30.) Certainly not, when the agreement has been wholly or partially executed. But if it has, the only effect it could have upon the agreement found by the referee was to convert it into a partnership at will. (*Wahl* v. *Barnum, supra.*) Such a partnership exists until something is done to dissolve it. (Lindley on Partner-

ship, 571.)  The plaintiff was not obliged to bring an action
for dissolution.  A partner in a going concern may bring an
action in equity to call his copartner to account, and to com-
pel him to act in conformity with the agreement, and an
accounting may be had without dissolution to enable him to
obtain his share of the partnership profits from the benefits of
which he has been excluded.  (*Traphagen* v. *Burt, supra;*
Lindley on Part. 478, 492, 494, 495 ; *Fairthorne* v. *Weston*, 3
Hare, 387 ; *Richards* v. *Davies*, 2 R. & M. [Ch.] 347 ; *Somerby*
v. *Buntin*, 118 Mass. 279 ; *Leavitt* v. *Windsor Land &
Investment Co.*, 54 Fed. Rep. 439.)

The action is not for specific performance of a verbal uncer-
tain agreement, but for an accounting concerning the profits of
a transaction which has been executed, though it may be that
the defendant excluded the plaintiff from participating in the
execution.

The defendant's father and partner, Samuel French, was
not a necessary party to the action.  The defendant and the
plaintiff, as individuals, were the only parties to the partner-
ship agreement found . by the referee.  The secret or undis-
closed arrangement between the defendant and his father, as
members of another firm, could not affect the rights of the
parties to this action.  (*Burnett* v. *Snyder*, 81 N. Y. 550 ;
76 N. Y. 349 ; Lindley on Part. 460.)

The division of profits was properly made according to the
terms of the agreement between the parties to the action, and
without regard to the interest which the defendant had in his
father's firm upon an accounting between themselves.  There
is not, we think, any substantial merit in the suggestion of
the learned counsel for the defendant that the agreement
found was a fraud upon the Broadway Theatre, or any of its
shareholders, or that the plaintiff is concluded by any estoppel,
or that a tender or offer in his complaint to pay the expenses
of procuring and exploiting the play was an indispensable pre-
requisite to his right to maintain the action.  The defendant's
rights, in these respects, have been very fully protected in the
accounting and judgment.

This was an equity case, and the disputed fact in issue was of such a character that the referee was warranted in admitting every act or declaration of the parties preceding or following the alleged agreement of April 25th, that could throw any light upon what really took place on that occasion. Considerable latitude of inquiry must be allowed upon the trial of such an issue. After examining the exceptions to the admission or exclusion of evidence, we are satisfied that none of them present any question of sufficient importance to justify the direction of a new trial.

So much of the order of the General Term as reverses the judgment in favor of the plaintiff and directs a new trial should be reversed, and the judgment entered on the report of the referee affirmed, with costs to the plaintiff in all courts.

All concur, except PARKER, Ch. J., not sitting.

Ordered accordingly.