GARFIELD L. MATTICE, Respondent, *v.* CHARLES S. MATTICE, Appellant.

(County Court, Schoharie County, July, 1913.)

**Damages — for injuries to a colt — negligence — evidence.**

> Plaintiff's colt between two and three years old escaped from its pasture, and after crossing the highway jumped over defendant's fence into his pasture from which a lane with a barb-wire fence on one side and a wall on the other with bars at the end, led into defendant's barn-yard, which was practically surrounded by a barb-wire fence about three feet high composed of three strands of wire with five sharp barbs to the foot, about half an inch long, and with no bar of wood or anything on top. Defendant, using his own horse as a decoy, got plaintiff's colt

back into the lane and put up the bars, and while he was leading his own horse across the highway plaintiff's colt jumped over the bars between the lane and the barn-yard and then jumped from the barn-yard over the wire fence between the barn-yard and the highway and in so doing became entangled in the barb wire. In an action for damages for injuries to the colt, held that there was evidence from which negligence on the part of defendant might reasonably be found, and that a judgment in plaintiff's favor would not be disturbed.

APPEAL from a judgment rendered by a justice of the peace in favor of plaintiff in an action for damages.

M. S. Wilcox, for appellant.

Charles E. Nichols, for respondent.

BEEKMAN, J.  This action was brought for damages resulting from plaintiff's colt being injured by coming in contact with a barb wire fence, which was alleged to have been a nuisance and to have been negligently maintained by the defendant.  The court below rendered judgment for the plaintiff.  The plaintiff had placed his colt to pasture on the pasture lot of his brother, a short distance from defendant's lands. This pasture lot was fenced.  Without the plaintiff's knowledge on the day of the accident, his colt in company with another colt in some way, not clearly shown, escaped from the pasture, crossed a highway and then jumped over defendant's highway fence at a point where plaintiff claims the fence was eighteen inches high, the defendant claiming that the fence at the point where they jumped over was four feet high.  No one saw them go over the fence but the location is sought to be fixed from the tracks found.  The colts having thus come upon the defendant's lands, the defendant. claims that they were trespassing and that, therefore,

he is not liable for any injuries which the plaintiff's colt later received by jumping over defendant's barb wire fence.

From this pasture a lane ran a considerable distance easterly down to the defendant's barn-yard. The lane had a wall fence on the northerly side thereof along the highway and a barb wire fence on the southerly side. Where the lane ran into the barn-yard there were bars which plaintiff testifies were about three feet high. The barn-yard was practically surrounded by barb wire except where the barn extended partly across the rear. The plaintiff and some other witnesses testify that this fence was three feet and four inches high, composed of three strands of barb wire, with sharp barbs about one half inch long, there being five barbs to the foot. The fence posts were about a rod apart. There was no bar of wood or anything on top. The northerly side of the barn-yard abutted the highway, fenced as above stated, there however being some evidence of the fence setting back about seven feet from where a stone fence along the highway used to stand.

The following is a part of the defendant's testimony on his direct examination: " Q. On or about the 10th day of September state whether you found this colt in your pasture with your horses or with one of your horses? A. Yes, I found him in the lane, he came down with my horses. Q. Did you go up in the lot after your horses? A. I started to go after one of them. When I got up there in sight I saw them coming. I thought they were my colts first. Q. What did you do with your horses? A. I took my horse out. Q. You got him and led him into the highway? A. Yes, sir. Q. What did you do with reference to putting up the bars? A. I took my horse into the highway and they followed. I took my horse and turned and led him back into the

lane and they followed. Q. You put up the bars leaving the two colts in the lane? A. Yes, sir."

The defendant testified he then took his horse into the road and " across lots right across the road." Later in detailing a conversation he had with the plaintiff, defendant testified " I said I shut him [the colt] back in the lane." In the testimony of one of the plaintiff's witnesses as to a conversation with defendant the following appears: " Q. What did defendant say about the injury? A. He said it was too bad, said it had spoiled the colt. Q. He thought they might jump over the fence when he took his own horse out? A. Yes, sir."

The defendant lived on one side of the highway and the plaintiff's father and brothers on the opposite side, the plaintiff being the nephew of the defendant.

After the defendant had shut plaintiff's colt and the colt running with him back in the lane and put up the bars, he took his own horse across the highway to a place about eight or ten rods away from the barn-yard where it seems his other horse had strayed and where, as one witness expresses it, the defendant was " leading one horse to get the other." While the defendant was thus engaged the plaintiff's colt and the one running with him jumped over the bars between the lane and the barn-yard and the plaintiff's colt jumped from the barn-yard, over the wire fence between the barn-yard and the highway, and in doing so became entangled in the barb wire. One witness saw the colt " kicking and thrashing around " on the barb wire fence. The colt was so severely cut as to be worthless, and was killed by direction of a veterinary.

As to the manner in which the colts got from the lane to the barn-yard there is the following testimony by the defendant. " Q. Did they in someway get over into the yard? A. Yes, sir. Q. Did you discover any

tracks? A. Yes I saw tracks and saw hair on the fence, this on the pole, they seem to have jumped right over the top of the post.''

It is apparent that, when the defendant took the colt back into the lane and put up the bars as the testimony shows, he assumed control over it and the situation is entirely changed from the case of a mere trespasser coming upon lands of another and meeting with an injury without any direct interposition or guidance by the owner of the lands. By taking charge of this colt and assuming the custody and control of it, the defendant assumed certain duties with reference to its safety.

'' The owner or occupant of land has the right to drive off animals trespassing on it and to use ordinary and reasonable means for this purpose. He may drive such animals into the highway and leave them to their fate for which he is not responsible.'' Shearman & Redfield Negligence (6th ed.) § 640. Instead of so doing, and instead of permitting the colt to continue to follow his horse along the highway, he leads his own horse back into the lane, until he gets the following colts into the lane, then leads his horse out again, and leaves the colts shut up behind the bars. He attempted to confine the colts on his premises and it is necessary to examine the surrounding circumstances to see whether the court below erred in finding that the plaintiff's property was injured by the maintenance of a nuisance or the negligence of the defendant.

The defendant finds the colt in the pasture and lane with his own horse. The colt is between two and three years of age and weighs about 1,000 pounds, and the propensities of the animal must be taken into account, the likelihood of its breaking over a barrier and the fact that the ordinary colt is more likely to leap fences

than an older work horse. A colt away from its usual pasture or enclosure would be apt to want to return to its home and especially as in this case where it had followed the horse with which it had been in company, and then been taken back to an enclosure, the same horse being used as a decoy to lead the colt back in the lane. Then the horse was led away from the colt. Naturally the colt seeing the horse being led away for a considerable distance within its sight and in a direction towards its usual place of pasturage would be restive and moved by its instinct to follow the horse or return to its usual haunts. This, the defendant, a farmer familiar with the habits of horses, may be supposed to have known. He knew the colt followed his horse out of the lane and when he used his own horse to get the colt to follow back into the lane he ought to have known that the colt would follow _again_ unless there was a sufficient barrier to prevent. Under the circumstances, when he shut the colt in the lane, with a barb wire fence on one side of the lane, the wall on the other and the bars at the end, it was to be reasonably expected that the colt would be apt to break over the fence or bars and then come into the barn-yard where the only barrier on the side towards the highway and the colt's usual place of abode was a barb wire fence three feet and four inches high, with no stick on top. The bars were only about three feet. Here the testimony of the witness above referred to as to what the defendant said is significant, " Q. What did the defendant say about the injury? A. He said it was too bad, said it had spoiled the colt. Q. He thought it might jump over the fence when he took his own horse out? A. Yes, sir," Neither the fence nor the bars would seem to be a proper fence to safely confine a colt of that age under the circumstances disclosed in the case, nor does it seem that the defendant used ordinary

diligence in caring for the colt he had undertaken to restrain on his land. Both the bars and the wire fence were so low as to invite the colt to jump over. The likelihood of a young horse coming in contact with a barb wire fence under the circumstances was bound to be attended with danger.

The character which is given barb wire fences is shown by reference to the statutes.

Section 369 of the Town Law provides that a division fence may be built of barb wire providing the owner of the adjoining property gives his written consent. If the adjoining owner refuses to consent to the building of such a fence it may be built in the following manner: '' The fence shall be of at least four strands of wire with a sufficient bar of wood at the top; and the size of such top bars and of the posts and supports of such fence and their distances apart shall be such as the fence viewers of the town may prescribe, and with posts no farther apart than fourteen feet; and such fence shall be otherwise substantially built and a reasonably sufficient inclosure for holding the particular kind or class of cattle or animals usually pastured on either side of the fence. * * * But any person building such a fence without the written consent of the owner of the adjoining property shall be liable to all damages that may be occasioned by reason of such fence.''

The legislature recognized the fact that even when the adjoining owner should consent the fence should have a sufficient bar at the top, and that it should be otherwise sufficiently built for the '' particular kind of animals, etc.'' A fence that might not be dangerous or insufficient for cattle might be very dangerous for colts or horses.

Section 32 of the Railroad Law absolutely prohibits

a railroad company from building a barbed wire fence along its right of way.

Section 56 of the Highway Law, which provides for the erection of wire fences for the prevention of snow blockades, further says, " In no case shall the town superintendent approve of or permit the use of barb wire for such fences."

All of these provisions of the statute are founded upon the notorious fact that barb wire fences are dangerous, and especially so when there is no board or bar on the top. The defendant exposed plaintiff's colt to the danger of coming in contact with this barb wire when he took charge of the colt.

In all the cases where the owner of the premises has not been held liable for injuries to trespassing animals, the circumstances have been such that the owner of the premises was not negligent in the care and treatment of the trespassing animal. In this case there was evidence from which the justice might reasonably find negligence on the part of the defendant.

The reasoning of the Supreme Court in the case of Loveland v. Gardner, 79 Cal. 317, is applicable. The court in that case says, " The defendants inclosed their land with a barb-wire fence, part of it running along a highway [then follows the description of the fence, three strands with no rail on top]. The question of negligence * * * was properly and fairly left to the jury under the instructions of the court. * * * We can not say that the evidence is insufficient * * * to support the verdict. [Then follows a citation of the California statute as to the manner of building wire fences, four and one-half feet high with rail on top etc.] Of course the liability of the defendants does not depend upon the question whether their fence came up to the legislative standard, which fixes the liabilities of owners of trespassing animals in certain counties, but

County Court, Schoharie County, July, 1913. [Vol. 81.

the act quoted shows what the legislature   *   *   * considered a good fence. The defendants were not bound to maintain any fence at all, but having undertaken to maintain one, they were bound to see that it was not made a trap for passing animals. It is the duty of the land owner to take notice of the natural propensity of domestic animals, and to exercise reasonable care to prevent his fence from becoming dangerous. The fact that the fence was constructed entirely upon the defendants' land is no defense, if negligently constructed or maintained. The case comes within the rule established by a recent decision of this court in Malloy v. Savings & Loan Soc., 21 Pac. 575. In that case the defendant had negligently suffered a privy vault and cess pool to remain open upon its premises, about ten feet from the side walk of a public street in the city of San Francisco, without any inclosure and plaintiff's minor child, without any fault or negligence on plaintiff's part, had fallen into the same and was drowned therein. The demurrer to the complaint which stated substantially these facts was sustained in the court below and the order reversed here. The decision was based upon the principle that one should so use his own property as not to injure the property of another.''

If it is reasonable that it should be provided by statute that an owner shall be liable for damages caused by construction of a division barb wire fence of four strands with a bar of wood at the top when the adjoining owner does not consent, a three strand barb wire fence without any top piece may reasonably be deemed dangerous and a nuisance and a person who places a colt in proximity to such fence may reasonably be considered guilty of negligence.

In this case now on appeal there was evidence from which the court below was authorized to find in favor

of the plaintiff.  I do not think the judgment should be reversed.  Rehler v. Western N. Y. & P. R. Co., 8 N. Y. Supp. 286; McCarragher v. Gaskell, 42 Hun, 451.

" It is manifest that the authority conferred by section 3063 of the Code upon County Courts to reverse a judgment of a Justice's Court because it is contrary to or against the weight of evidence, is to be exercised only when the judgment is so plainly against the weight and preponderance of proof that it can be seen that the justice could not reasonably have arrived at the decision which he made.  The County Court by this provision of the Code has no greater power over judgments rendered by justices of the peace than has the Appellate Division and Court of Appeals over judgments of courts and referees.  \* \* \* 'A court on appeal cannot set aside the findings of the trial court merely because they are of opinion that, upon the record before them, they would feel constrained to find the fact the other way.' "  Murtagh v. Dempsey, 85 App. Div. 204, 205, 206; Sanger v. French, 157 N. Y. 213; Vandeymark v. Corbett, 131 App. Div. 391–394.

The judgment appealed from is affirmed, with costs.

Judgment affirmed, with costs.