Nancy EBKER, Plaintiff-Appellant,
Cross-Appellee,

v.

TAN JAY INTERNATIONAL, LTD. and
Peter J. Nygard, Defendants-Appellees,

Tan Jay International, Ltd.,
Cross-Appellant.

Nos. 1178, 1171 and 1177, Dockets
81–7854, 84–7032 and 84–7060.

United States Court of Appeals,
Second Circuit.

Argued May 7, 1984.

Decided July 17, 1984.

Debra A. Roth, Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for plaintiff-appellant, cross-appellee.

John F. Triggs, Slade & Pellman, New York City, for defendants-appellees and cross-appellant.

Before FRIENDLY and WINTER, Circuit Judges, and LASKER, Senior District Judge.[*]

FRIENDLY, Circuit Judge:

This case is a further illustration, if one were needed, of the unwisdom of continuing diversity jurisdiction, 28 U.S.C. § 1332, and particularly that portion of the diversity statute permitting such jurisdiction to be invoked by an in-state plaintiff.[1] There is no federal interest in this lawsuit except for that engendered by the disregard by trial counsel of a federal procedural rule; it is the kind of case that the New York courts handle regularly. It was pending in the district court for nearly six years and, after extensive pretrial proceedings, consumed eight days of trial time. It involves several troublesome points of New York law, on at least one of which the court seems to have been led into error by a proposal by one counsel to which no objection was made by the other. Worst of all, counsel treated the provisions of Fed.R. Civ.P. 50(b) with respect to a motion for judgment notwithstanding the verdict as if they did not exist and as if the practice concerning such a motion were governed by the less formal provisions of N.Y.CPLR 4404. *See also* N.Y.CPLR 4401. Many days of effort on our part have been required to disentangle the resulting confusion, at the cost of time that should have been devoted to our ever-mounting caseload of appeals where federal interests are implicated. Finally, as a result of our rul-

---

* Honorable Morris E. Lasker of the United States District Court for the Southern District of New York, sitting by designation.

1. See, as a sampling of the literature to this effect, *Smith v. Metropolitan Property & Liability Ins. Co.*, 629 F.2d 757, 761 (2 Cir.1980) (Mansfield, J., dissenting); *Evans Transp. Co. v. Scullin Steel Co.*, 693 F.2d 715, 717 (7 Cir.1982) (Posner, J.); *Martin v. Gibson*, 723 F.2d 989, 993 (D.C.Cir.1983) (per curiam); Friendly, *Federal Jurisdiction: A General View*, 139–52 (1973); Friendly, *Averting the Flood by Lessening the Flow*, 59 Cornell L.Rev. 634, 640–41 (1974); Bork, *Dealing with the Overload in Article III Courts*, 70 F.R.D. 231, 236–37 (1976); Rowe, *Abolishing Diversity Jurisdiction: Positive Side Effects and Potential for Further Reforms*, 92 Harv.L.Rev. 963 (1979). There is, of course, an abundant literature to the contrary.

ing there must be still further proceedings in the district court and perhaps a further appeal.

### The Proceedings in the District Court

The complaint, filed in the District Court for the Southern District of New York on March 1, 1978, alleged that plaintiff Ebker had achieved a national and international reputation as a designer and merchandiser of women's wearing apparel. In 1976, she entered into an employment agreement with Genesco, Inc., to be president of its Susan Thomas Sportswear Division, the products of which included the Vivo and Susan Thomas sportswear labels and a newly created Sportswork-Nancy Ebker label. Her contract with Genesco provided for a salary of $152,500 for the period ending July 31, 1977, which was to increase annually up to a maximum of $187,500 until July 31, 1979, when the contract expired. If Genesco terminated the contract earlier, Ebker was to be compensated at the annual rate of $152,500 less any amounts received from a new employer.

About August 1977 Genesco decided to dispose of its apparel manufacturing operations and so advised Ebker. However, Genesco gave Ebker an opportunity to reap the benefits of her reputation by allowing her to purchase such assets of the Susan Thomas Division as were essential to the continued production of its labels. Ebker was thereafter contacted by Peter Nygard, the principal shareholder and chief executive officer of defendant Tan Jay International (Tan Jay), a Canadian corporation. He stated that Tan Jay had been attempting to enter the United States market and proposed that he and Ebker enter into negotiations for the acquisition and continuation of the Susan Thomas Division. The complaint, as amended by a pre-trial order nearly three years after its initial filing, alleged that the negotiations between Ebker and Nygard, who was said to be acting not only as the chief executive officer of

Tan Jay but also on his own behalf, were concluded on or about November 26, 1977,

> by the making of an agreement (the "Agreement") which provided, among other things, that they would enter into and undertake a joint venture as "FIFTY/FIFTY (50/50) partners," Ebker owning a one-half (½[ ) ] interest and Nygard and Tan Jay together owning a one-half (½) interest of said joint venture.

Jt. Pre-Trial Order ¶ 3(2), 1 Jt.App. at 24. The alleged oral agreement included the organization of a new company, with Ebker as president, to carry on two labels of the Susan Thomas Division: the Vivo label, in the future to be known as Bianca (a Tan Jay label), and Sportswork-Nancy Ebker, in the future to be known simply as Nancy Ebker. Tan Jay was to provide the funds for the acquisition of the needed assets from Genesco. Ebker was to receive: (1) an annual salary of $50,000; (2) 50% of the net pretax profits from sales under the Nancy Ebker label; and (3) 5% of the Bianca label's net pretax profits from sales of the spring, summer and fall Vivo collections, and thereafter from sales of all 1979 to 1982 Bianca collections. The complaint charged that in early February 1978, Nygard and Tan Jay repudiated the agreement in various ways, including the exclusion of Ebker from the premises on which operations were being conducted. The defendants counterclaimed that after Ebker's discharge she had disrupted Tan Jay's business operations, and sought compensatory and punitive damages.

The appendix does not include any portion of the 362 page transcript of a four day pretrial hearing before the district judge, which had a vital bearing on the trial, and references to it in the briefs are few and without page citation. The judge was concerned, *inter alia,* about the term the alleged joint venture was to have. Plaintiff's counsel insisted that the term was for five years.[2] The judge warned

---

**2.** The counsel who represented Ebker at trial was not the counsel who represented her on appeal.

that such a claim would be perilous in light of the one-year section of the New York Statute of Frauds, which we quote in the margin.[3] Plaintiff's counsel insisted that the New York Statute of Frauds did not apply to joint ventures at all. He conceded that if the statute applied, the five-year joint venture agreement would be treated as a partnership at will, but maintained that Ebker would still be entitled to an action at law for damages for its breach as well as an accounting. Defendant's counsel disputed plaintiff's ability to maintain such a damages action and argued that, in view of the concededly short duration of the alleged joint venture and its operation at a loss, an accounting would be pointless. Finally, the judge decided that a first trial should focus on the question whether there had been a joint venture between Ebker and Nygard or Tan Jay; all other issues would be reserved. Regrettably these directions were not embodied in an order.

Plaintiff's case rested primarily on her own testimony which, in view of the attack on the sufficiency of the evidence, we must set forth at tiresome length: Nygard called on Ebker at the Susan Thomas showroom on November 17, 1977. She explained some of her ideas to him, and they arranged a luncheon meeting for the following day. Over lunch, Nygard described "how Tan Jay was built up to a $30 million business", that he had $5 million to invest in the United States, and that he was interested in the Nancy Ebker label. Ebker declined to discuss a deal unless it also included the lower-priced Vivo line. Nygard said he already had a line in Canada called Bianca which was similar to Vivo and would be open to discussing the Vivo line in addition to the Nancy Ebker line. After returning to her office Ebker stressed that she would not consider less than a 50–50 partnership. Nygard replied, "Well, that's no problem," and "You can maintain your office exactly the way you've done, and the only difference would be that we move Tan Jay into the showroom and sell the three lines out of the showroom." Nygard also requested that Ebker stop negotiating with other potential backers. Although she believed herself to be within a day of striking a deal with one interested party, Ebker complied. Nygard then departed for Frankfurt and Ebker for California. It was later arranged that they meet again in London. Most of the conversations there, some attended by Ebker's associate, Leamond Dean, took place at the Inn on the Park, a luxury hotel where both Nygard and Ebker were staying. Ebker and Nygard discussed the capitalization that would be needed to finance the two lines. The parties discussed separating Ebker's label, which was produced under a union contract, from the non-union Tan Jay operation and converting the unionized Vivo label into the Bianca label, which was to be manufactured in Tan Jay's non-union California plant. The two would be 50–50 partners on the Nancy Ebker label, but Ebker was to have only five percent "of the pretax profits on Bianca because [Nygard] would be handling this production."[4]

**3.** N.Y.Gen.Oblig.Law § 5–701(a) provides:

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime. . . .

This differs from the statute of Charles II, An Act for Prevention of Frauds and Perjuries, 1677, 29 Car. II, ch. 3, § 4,—by including the words "by its terms". The insertion was evidently intended to overcome the line of cases holding that any contract involving personal services, no matter what its duration, escaped the statute since it could be "performed" if one party died within a year, *see, e.g.,* *Warner v. Texas & Pacific Ry.,* 164 U.S. 418, 434, 17 S.Ct. 147, 153, 41 L.Ed. 495 (1896); *Ford Motor Co. v. Maddox Motor Co.,* 3 S.W.2d 911, 915 (Tex.Civ. App.1928)—a view condemned as confusing performance with discharge, *see, e.g.,* *Cohen v. Bartgis Bros.,* 264 A.D. 260, 35 N.Y.S.2d 206, 208 (1942) (collecting cases); 3 Williston, Contracts § 496, at 587–89 (3d ed. 1960).

**4.** The transcript says 50 percent but later portions show this to have been a typographical error.

Nygard agreed that Ebker's management people should remain.

In answer to questions by the court, Ebker repeated that they would be 50–50 partners in the "Nancy Ebker" label and "it was going to be a company."[5] There was a problem about a licensing contract between Genesco and a Canadian company called Marbrooke, giving Marbrooke an exclusive distribution arrangement on the Nancy Ebker label in Canada. For the time, this issue was "left up in the air." So also was the question of what price Genesco would ask for the inventory and other tangible assets necessary for continued production of goods under the Nancy Ebker label. Ebker was to be responsible for "completely running" her label, including "merchandising, designing, ordering piece goods, following through on production, fit, quality, sales, ... all the way through store seminars", but on "Bianca" she would be responsible only up to the point when designs were sent to California for production. According to Ebker, "he [Nygard] kept relating to this as a partnership." Each was to take a $50,000 annual salary out of the Nancy Ebker label, but Ebker's was to be in the form of $40,000 a year plus a 10% bonus (apparently meaning a $10,000 bonus), so as "not to upset the applecart in Canada." In response to a question from the court, Ebker explained that Nygard insisted that "we should not tell anyone [in his] management team that we were 50–50 partners because they would be upset ... He was planning to make managers partners of some sort in a couple of months...." Also, no one in his company earned a salary of more than $40,000 a year. With respect to the duration of the arrangement, she testified as set forth

in the margin.[6] One night in London, Ebker and Dean dined out with Nygard and two Tan Jay employees; Nygard picked up a wine glass and said, "Well, here is to your partnership".

Ebker and Nygard then returned to New York together in order to attend a meeting with a Genesco official. The court prevented Ebker from relating what was discussed. After he left, Nygard again raised a question about Genesco's insistence on an assumption of the Marbrooke contract. Ebker foresaw another problem, namely, that Genesco would demand as a condition to the purchase of the assets of the Susan Thomas Division that Ebker forego her employment contract. This concerned Ebker for two reasons. First, although under the "joint venture partnership [Ebker and Nygard] would both be getting profit in the second year," she would earn only $50,000 in the first year rather than the $152,500 salary guaranteed her by the Genesco contract. Second, Ebker needed income to offset $40,000 in expenses she had personally incurred to keep the Susan Thomas line operating until a backer could be found.

On the next day, November 27, there were several discussions, some with Genesco and some between Nygard and Ebker. Nygard proposed to put the Marbrooke contract in a shell corporation wholly owned by Ebker. She said she had "researched" a company, to wit, the Nanco Group. The "research" had evidently been with respect to trademark problems. Nygard suggested that the Marbrooke contract be "put" with the Nanco Group, which was not to have any profits and thus could not be sued successfully. Although she insisted that she intended to fulfill the contract, Ebker agreed with Nygard's sug-

5. Much difficulty was caused by Ebker's repeated use, whether inadvertent or intentional, of the word "company" as interchangeable with "label" or "line". Her continued reference to Nygard as "he", without making clear whether Nygard was speaking for himself or for Tan Jay, caused similar difficulty. Nygard did the same with "I" and "we". The court made some efforts to achieve clarification, particularly with Ebker, but later gave up, evidently considering, with some reason, that the task was hopeless.

6. What was said was I showed Mr. Nygard five-year projections. Mr. Nygard worked on the five-year projections and that is when he said, "I'm already a millionaire and you will be a millionaire. In five years we will take the company public. We should have a $50 million company on Vivo and a $25 million company on the Nancy Ebker label."

1 Jt.App. at 146.

gestion and proposed they telephone Genesco to check if it would approve such an arrangement. After doing so, she said, "All right, Peter, I think it looks like we have a deal." Ebker then proposed that they "sit down and make sure that we do."

According to Ebker's testimony, at that point the parties began to outline the contours of their joint venture. Nygard's first item was that Ebker would "maintain her office." Ebker went on to explain, in a confirming way, that this was her existing office at the Susan Thomas Division, located at 1411 Broadway in New York City, "a 10,000 square foot space, with a showroom, design room, pattern room, and ... a production chart which showed the whole workings of the system from beginning to end." Nygard said Ebker was to "maintain control ... of all these aspects through production on the Nancy Ebker line," just as she had done with Genesco, and that she would "run [her] company as president of that line." He concluded with the statement, "Here we'll be 50–50 partners." Ebker called this operation the Nancy Ebker Company, see *supra* note 5, although there seems to have been no understanding as to what legal form it would take. They then reviewed Ebker's five-year projections which predicted that they would reach a break-even point within nine months. Nygard said "Yes, I will fund the company until the break even point." At this time, Ebker clarified her understanding that after the break-even point was reached they would divide the profits, to which Nygard added, "And of course the losses."

Turning to the Vivo line, Ebker said, "As far as Vivo goes, we will put it in your name, which we have discussed before, in your name, 'Bianca'...." Inquiry by the court elicited that in fact the Bianca name was owned by Tan Jay; however, Ebker testified that, "Mr. Nygard always told me that he owned Tan Jay." After reiterating that the Bianca line would be produced in California, Nygard stated, "[W]e will decide what your [Ebker's] title will be later on this." They confirmed that Ebker was

to receive five percent of the Bianca label's pretax profits.

Nygard then asked that Ebker incorporate the Nanco Group immediately. The corporation was to assume the Marbrooke contract and to lease facilities where the union would work on the Nancy Ebker line so that Tan Jay could remain "completely separate from the union situation."

Ebker then said she was going to make a list of things that needed "to be done right now." First, Nygard wanted her to instruct his advertising agent to do an ad "on the two of us linking us together on our joint venture to show the world that we did it with the concept we have done it separately, now we're going to do it terrifically together." Second, Ebker volunteered to write letters explaining the transaction to her nation-wide network of buyers who had already ordered over $320,000 worth of goods; Nygard approved. Third, her management team and their salaries were to remain largely unchanged, except that, at Nygard's insistence, two members whose compensation exceeded $40,000 were to receive only $40,000 in salary and the remainder in a bonus at the end of the year. Fourth, Ebker was to work with Court Joel, Nygard's controller, to prepare budgets and projections for the line. Fifth, Nygard asked Ebker to call her press agent and set up a meeting for the next day "because we would like to send out a release on our joint venture."

Ebker then insisted that their agreement be put in writing. Nygard replied, "We are going to be partners. We must trust each other." He feared that if lawyers got involved "right now," they would just "mess everything up and take too long." Finally, after explaining that he had to leave the next day and promising to return in February to "get everything done," Nygard authorized Ebker to conduct all remaining negotiations with Genesco.

These negotiations resulted in Genesco's selling to Tan Jay the inventory and other assets needed to produce the Ebker line, with Tan Jay buying the piece goods at a

25% discount.[7] Prior to the closing on December 9, 1977, there was a speakerphone call between Nygard at his Winnipeg factory and Ebker, Court Joel and Nygard's attorney in New York. Ebker said her attorney, who was also present, was concerned because she was assuming the Marbrooke contract but "had no coverage" if Marbrooke sued her. Nygard said he would "cover" her but that "a year or two down the road when we are both making profits together, being 50–50 partners you are going to have to pay me back 50 percent of any liability I may suffer from this lawsuit." After the closing Ebker started designing the summer line; this required long hours of work to make up for the time that had been lost since Genesco had decided to discontinue operations. The flow of the testimony was then interrupted by an interlude which we quote in the margin.[8]

Ebker went on to testify that Nygard had also insisted on bringing his Tan Jay line and two employees into "my showroom" but that "[t]hey would have nothing to do with the functioning of my company ...," see *supra* note 5. In January Nygard's attorney "signed for" space on 37th Street for "Nanco"; apparently this was used for production and shipping. Ebker's testimony concluded with a description of a February 13, 1978 discussion between herself and Nygard, in the presence of Dean and two other employees, concerning a dispute over architectural plans for remodelling the showroom. Ebker said, "You can't do this, Pete. We're partners." Nygard responded, "Yes. But unfortunately for you I'm the partner with the money," see *supra* note 5. Ebker did not describe just how the venture ended, presumably because such evidence was not thought to bear on the issues framed at the pretrial conference.

Cross-examination brought out a number of facts working against Ebker's claim: Tan Jay paid the rent on the showroom at 1411 Broadway and had its sign on the door. The advertisement commissioned by Ebker and signed by her, which was published in *Women's Wear Daily*, recounted the history of the negotiation but made no mention of a partnership or joint venture; instead it said that Ebker would design her "heart out for both Nancy Ebker and for Bianca (Peter's American company)." Ebker sought to explain the lack of any reference to the partnership as advertising license and contended that there were other advertisements that referred to "Nancy's company." Ebker's tax return for 1978 showed receipt of a salary at the annual rate of $40,000, with a legend "Taxpayer entered into an employment agreement with Tan Jay International."

On redirect plaintiff's counsel introduced another advertisement signed by Nygard as president of Tan Jay, entitled "We did it!" This advertisement said that Ebker "is with us as a strong member of the 'merchandising committee' for Tan-Jay, designing Bianca and running her Nancy Ebker division," and concluded, "We've been successful separately ... WAIT TILL YOU SEE US TOGETHER!" Then Dean took

---

7. There is some discrepancy in the record over whether Tan Jay purchased the Genesco "piece goods" at a 20% or a 25% discount. We encountered difficulty in stating the facts as a result of the failure of counsel to reproduce pertinent exhibits in the joint appendix, see Fed.R.App.P. 30(e), or to have them included in the record transmitted by the district court, or even to have them forwarded to the district court so that they would be conveniently available to us. See 2d Cir.R. § 11. Ultimately we requested our clerk to obtain the exhibits, which arrived after some delay.

8.    Q [by plaintiff's counsel] You used a term before joint venture. Is that a term that you used or what?

A  That was a term that Mr. Nygard used.
Q  Did he describe it to you?
A  He described it to me as a partnership, a 50–50 partnership. We discussed losses. He discussed assuming the losses, assuming the profits. We had begun this discussion when—he began this discussion in London.
Q  When you say partnership, 50–50 partnership, who were to be the partners?
A  Mr. Nygard and myself.
Q  And what about Tan Jay?
A  Tan Jay was to fund the partnership.
1 Jt.App. at 196.

the stand and corroborated parts of Ebker's story, notably her testimony concerning references to a "partnership" in statements Nygard made at the London restaurant and during the February 13 meeting. Plaintiff rested after reading the deposition of Attorney Joel Arnold regarding the preclosing speakerphone conversation with Nygard. Arnold, who represented Ebker at the meeting, urged that the agreement be reduced to writing but Nygard refused ostensibly because of fear that the provision concerning Marbrooke might be used against him in future litigation. Also, at one point Nygard said, "Nancy, it is your company. You are going to run it." With that, plaintiff completed her case.

Counsel for defendants moved "to dismiss the plaintiff's case" on the basis of "two fundamental points." One was Ebker's admission quoted, *supra* note 8, that Tan Jan was not to be a partner; on that basis he moved for a directed verdict with respect to Tan Jay. The second was the lack of any evidence concerning the duration of the alleged joint venture; here he called attention to the testimony quoted in note 6 above. There was an extended colloquy, the most important part of which was a reference by defendants' counsel to a presumption, argued to be supported by citations in his pretrial brief, that "when Mr. Nygard acted he acted on behalf of his company." At the conclusion of the colloquy, the court said:

> Mr. Triggs [defendants' counsel], I will reserve on your motion and I will let Mr. Epstein [plaintiff's counsel] argue to the jury.

1 Jt.App. at 302–03.

When called to testify, Nygard did not deny that the various meetings to which Ebker testified had occurred but drew a quite different picture of what had transpired. Although he had learned at the outset that Ebker "had only been negotiating on a partnership basis," she told him this was no longer a condition. Her efforts to find backers who would put up the money but leave her in control had been unsuccessful and time was now running out.

After asserting that he would not be interested in moving quickly, Nygard said, "[U]nder no circumstances would I be in any kind of position to talk equity to her at this particular time." Moving to the London meetings, Nygard conceded having expressed interest in purchasing the Genesco inventory related to the current sales and in acquiring the New York and Chicago leases of the Susan Thomas Division. He did, however, have reservations about certain elements of the deal—the Marbrooke contract, his ability to fulfill the $300,000 of orders that were on the books, and the validity of Ebker's five year projections. He told her that Tan Jay could not, and would not, pay her more than $40,000 a year and a $10,000 bonus. Ebker responded that she couldn't live on $50,000 a year, but that the figure would be all right since she was guaranteed income from Genesco. He told her "that under no circumstances would there be any equity position now." Ebker accepted this since her present interests were to keep the Nancy Ebker line alive and to have some sort of title; he told her she could be a vice president.

There is no need to detail Nygard's testimony concerning what happened after their return to New York, except to recite his quite different version of the speakerphone call. According to him, he told Ebker's attorney that Ebker would receive only a $40,000 salary and a $10,000 bonus, and that "[t]here is no partnership involved." Arnold then asked Ebker whether that was all right, to which she responded in the affirmative. Nygard was not asked about his alleged toasting to the partnership in London or the reference to it at 1411 Broadway on February 13.

The defendants rested after the conclusion of Nygard's testimony. Plaintiff introduced one exhibit in rebuttal. Counsel proceeded to sum up, without defendants' counsel having moved for a directed verdict. The court then instructed the jury. She charged, without objection, that "a joint venture comes about as a result of a mutual agreement between two or more

parties to associate themselves together in a particular business" and that,

> before you may return a verdict for the plaintiff, you must be persuaded by a fair preponderance of the credible evidence (1) that the parties to the joint venture agreed to have joint ownership and control of the property of the venture; (2) that the parties to the joint venture agreed to contribute financial resources, skills or knowledge, best efforts or a combination of these to the venture; (3) that the parties to the joint venture agreed to share the profits and the losses of the joint venture; and, in terms of this case, (4) that the parties to the venture agreed that the joint venture was to have a duration of five years.

1 Jt.App. at 455. She put two questions to the jury which we set out in the margin.[9] She then gave the following additional instruction without objection:

> One of the principles of law that I should charge you with in considering your verdict as to the defendants in this case is that Mr. Peter Nygard is the president of Tan Jay International. The law presumes that an officer of a corporation, acting in the business of the corporation, acts on behalf of the corporation and not in his individual role.

1 Jt.App. at 458-59.

After having deliberated for some time, the jury inquired:

> What exactly is Miss Ebker's claim? Is she claiming to be a partner of Tan Jay or a partner of Mr. Nygard?

With the agreement of the attorneys, the court responded:

> Miss Ebker claims she is a partner of both Peter Nygard and Tan Jay.

After an overnight adjournment the jury asked for an explanation of the judge's charge describing "the legal definition of a joint venture and all its elements." The judge responded by repeating her previous instructions as to the elements of a joint venture; she also repeated the presumption charge. An hour later the jury returned a verdict, answering the first question "Yes" and the second "No."

After the jury was discharged, the court inquired what was the pleasure of counsel as to the first verdict. Defendants' counsel said he "would like to renew the motion as to Mr. Nygard" on three grounds. These were (1) the absence of proof that Nygard was acting in his individual capacity— "[t]here is nothing sufficient to overcome the presumption"; (2) the absence of proof of a term; and, (3) the fact that it was not Ebker's intention to enter into a joint venture with Nygard alone, but rather with both Nygard and Tan Jay and the latter's participation was now negated by the second verdict. After hearing argument, the judge found that there was insufficient evidence to overcome "the presumption that a person acting in the capacity of a president of a corporation acts on behalf of his principal" and that "the verdict of the jury, finding by a fair preponderance of the credible evidence that Mr. Nygard was in fact acting for himself, is inconsistent with the evidence." She therefore set aside the verdict of a joint venture between Ebker and Nygard. The court later signed an order reciting that with respect to the first count of the complaint, the jury had rendered a verdict in favor of Tan Jay and that its verdict against Nygard had been set aside by the court; that defendants' motion to dismiss the second and third counts for failure to state a claim was granted; that the entire complaint be dismissed; and that the defendants' counterclaim be severed and placed on the court's suspense calendar.

Trial of the counterclaim was had before a different jury some two years after trial

---

**9.**   1. "Do you find the plaintiff, Nancy Ebker, has proven, by a fair preponderance of the credible evidence, that she entered into an oral joint venture partnership agreement with the defendant Peter Nygard?"

  2. "Do you find that the plaintiff, Nancy Ebker, has proven, by a fair preponderance of the credible evidence, that she entered into an oral joint venture partnership agreement with the defendant Tan Jay International?"

1 Jt.App. at 458. The jury was to answer either "yes" or "no" to each question.

of the claim. At the outset of the trial the judge stated:

> [S]ince the jury found that there was no joint venture relationship between Nancy Ebker and Tan Jay, the only relationship that can be asserted now vis-a-vis this counterclaim is that of employer, being Tan Jay, and employee, being Ebker.

2 Jt.App. at 489. The evidence showed that on February 14, 1978, Nygard discharged Ebker and she cleared out her office. Two weeks later, at a time when Tan Jay was to complete its first major shipment, Ebker caused a locksmith to weld shut the doors of the warehouse containing finished goods for the Nancy Ebker line (which Tan Jay had financed), as well as piece goods and salesmens' duplicates for Tan Jay's Bianca line, thereby causing Tan Jay to miss shipping dates. Ebker sought to defend her conduct by claiming that Tan Jay was shipping clothing with her label on it in a disorderly manner. Tan Jay sought to prove its damages by showing that Ebker's lock-out caused Tan Jay to suffer losses as a result of its inability to fill existing orders from American customers on time. Court Joel, the firm's executive vice president for finance and administration, testified that whereas Tan Jay historically had returns, markdowns and allowances totalling approximately 5% of gross sales, that rate reached nearly 33% with respect to the two clothing lines whose deliveries were delayed by the lock-out.[10] He also related that Tan Jay lost approximately $800,000 on its American operations in 1978. Nygard, Tan Jay's next witness, alleged that the lock-out was responsible for the precipitous rise in the rate of customer discounts; he stressed that

Tan Jay's relatively poor performance with the deliveries of the 1978 Ebker and Bianca lines hindered its successful entrance into the lucrative American market.

The court asked the jury to make findings with respect to three of Tan Jay's claims: (1) Ebker's lock-out and refusal to release goods to Tan Jay; (2) Ebker's wrongful interference with Tan Jay's contractual relationships; and (3) Ebker's attempt to prevent Tan Jay's entrance into the United States market. She refused to permit the jury to consider Tan Jay's claim for punitive damages, believing that they were not available under New York law. The jury found for Tan Jay in the amounts of $4,000 on the first claim and of $318,718 on the second, and for Ebker on the third. The court denied a motion by plaintiff's counsel to set aside the verdict, and judgment was entered thereon.

Ebker has appealed from the judgment setting aside the verdict in her favor on the trial of the claim and from the judgment on the counterclaim; Tan Jay has appealed from the court's refusal to allow the jury to consider awarding punitive damages on the counterclaim.

## DISCUSSION

I. *The setting aside of the verdict that Ebker and Nygard had engaged in a joint venture*

A. *Procedural points*

Ebker mounts a challenge to the procedural propriety of the court's setting aside the jury's verdict that she and Nygard had engaged in a joint venture. She contends that the court violated Fed.R.Civ.P. 50(b), which we quote in the margin,[11] in two

10. For the period December, 1977 to the summer of 1978, the Ebker line had gross sales of $214,000; returns, allowances and markdowns amounted to $56,000. The Bianca line during this period had gross sales of $986,000; returns, allowances and markdowns amounted to $322,-000. See 2 Jt.App. at 609–11 (Testimony of Court Joel).

11. (b) **Motion for Judgment Notwithstanding the Verdict.** Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not grant-

ed, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion

material respects: The first is that the rule permits a motion for judgment notwithstanding the verdict only in cases where a motion for a directed verdict has been made at the close of all the evidence but here defendants' counsel did not make such a motion. The second is that after the verdict counsel did not move *in ipsissimis verbis* "to have the verdict ... set aside and to have judgment entered in accordance with his motion for a directed verdict" but simply renewed the motion to dismiss that he had made at the close of plaintiff's case. Plaintiff asserts that her position on the latter point is supported by the 5–4 decision in *Johnson v. New York, New Haven & Hartford Railroad*, 344 U.S. 48, 73 S.Ct. 125, 97 L.Ed. 77 (1952).

Defendants' first response is that plaintiff is precluded from advancing these claims because her trial counsel did not raise them below but objected to a grant of the post-verdict motion only on the merits. In support of this position, counsel cites a sentence from *Vintero Corp. v. Corporacion Venezolana de Fomento*, 675 F.2d 513, 515 (2 Cir.1982), which cites *Schwimmer v. Sony Corp.*, 637 F.2d 41, 49 (2d Cir.1980), which in turn cites a long string of cases. However, *Vintero* also says, with citation of authority, that "when a party raises new contentions that involve only questions of law, an appellate court may consider the new issues", 675 F.2d at 515. We suspect that the decision on this subject have not been entirely consistent. Perhaps the only overarching rule that can be distilled is that appellate courts will consider points not raised below which do not require new evidence or factual findings when they deem this to be in the interest of justice but not when they don't. A subset of this "rule" is that appellate courts will not consider a point not raised below when the alleged error could readily have been cured if a timely objection had been made.

■ The latter principle is enough to dispose of the challenge based on the failure of defendants' counsel to rephrase his motion after the verdict. It is too obvious to require discussion that had plaintiff's counsel objected to the court's entertaining the motion because it did not ask in terms that judgment be entered notwithstanding the verdict, defendants' counsel would have cured the defect in a matter of seconds. *Johnson* is not to the contrary. There the post-verdict motion by the railroad's counsel was simply "to have the verdict set aside on the ground that it was excessive, contrary to the law, to the evidence, [and] to the weight of the evidence", 344 U.S. at 49, 73 S.Ct. at 126. The defendants' motion did not by its terms challenge the sufficiency of the evidence. Plaintiff's counsel had no reason to think that defendants' counsel was doing this, and there was no occasion for him to ask the defendant to seek more than it had. In contrast to the instant case, the trial court *denied* the motion, and the direction to enter judgment notwithstanding the verdict was made by this court—if indeed it was made then, see 344 U.S. at 54–55 n. 3, 73 S.Ct. at 128–129 n. 3—when plaintiff's counsel no longer had an opportunity to object.[12] Here, in

---

for a directed verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial. Fed.R.Civ.P. 50(b).

**12.** At least one court of appeals has taken the view that *Johnson* was properly rested on the fact that the "plaintiff had been prejudiced by

denial of an opportunity to urge before the trial court that a new trial should be awarded rather than a judgment notwithstanding the verdict." *Shaw v. Hines Lumber Co.*, 249 F.2d 434, 438 (7 Cir.1957). See 5A Moore, Federal Practice ¶ 50.09, at 50–94 and 50–95 (2d ed. 1984), approving the *Shaw* decision, *contra*, 9 Wright & Miller, Federal Practice and Procedure: Civil § 2537, at 604–05 (1971). Here the renewed motion of defendants' counsel and his argument in support of it clearly conveyed that he sought dismissal because of insufficiency of the evidence. Plaintiff's counsel having joined issue on that basis, plaintiff should not be allowed to take advantage of a technical defect in the mo-

sharp contrast to *Johnson*, the colloquy and the lack of procedural objection make plain that plaintiff's counsel and the court were fully aware that defendants' counsel was asking, however inartistically, the court to enter judgment n.o.v.

■ It is not so clear that the failure of plaintiff's counsel to object bars consideration of the other procedural claim, namely, that Nygard's counsel was precluded from moving for judgment n.o.v. by his failure to request a directed verdict at the close of the whole case.[13] In contrast to the lack of clarity in the defendant's post-verdict motion, the omission of a motion for a directed verdict at the close of the whole case was no longer curable. Still it does not necessarily follow that it is now incumbent upon us to insist on compliance with the letter of Rule 50(b) when plaintiff's counsel acquiesced in a departure from it.

There is a flourishing body of case law on the subject of when a motion for judgment n.o.v. may be entertained despite failure to move for a directed verdict at the close of the case. Some of the more important decisions, which are not altogether consistent, are *Bayamon Thom McAn, Inc. v. Miranda*, 409 F.2d 968, 971–72 (1 Cir.1969); *Moran v. Raymond Corp.*, 484 F.2d 1008, 1010–14 (7 Cir.1973); *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572 (7 Cir.1976); *De Marines v. KLM Royal Dutch Airlines*, 580 F.2d 1193 (3 Cir.1978); and *Martinez Moll v. Levitt & Sons of Puerto Rico*, 583 F.2d 565, 568–70 (1 Cir. 1978). Other cases are collected in 9 Wright & Miller, Federal Practice and Procedure: Civil § 2537, at 597–98 n. 32 (see particularly Supp.1982). The Moore treatise begins by saying,

tion which would have been readily corrected if objection had been made.

**13.** We note in passing that while the first sentence of Rule 50(b) speaks of "a motion for a directed verdict made at the close of all the evidence," the second sentence speaks only of "a party who has moved for a directed verdict." However, the Notes of the Advisory Committee on the 1963 Amendment say:

[i]t must be remembered that when a defendant, after moving for a directed verdict at the conclusion of the plaintiff's case, fails to renew his motion at the close of all the evidence, he is deemed to have waived his right to move for judgment notwithstanding the verdict.

5A Moore, Federal Practice § 50.08, at 50–89 and 50–90 (2d ed. 1984), but then adds,

[h]owever, some fairly recent cases have held that a motion for judgment notwithstanding may be granted despite the party's failure to renew his motion for a directed verdict where: (1) The court indicated that the renewal of the motion would not be necessary to preserve the party's rights; and (2) The evidence following the party's unrenewed motion for a directed verdict was brief and inconsequential.

*Id.* at 50–90.

■ This case meets the first branch of Moore's formulation. Indeed, the court's ruling on the motion made at the close of plaintiff's case, "I will reserve on your motion and I will let Mr. Epstein [plaintiff's counsel] argue to the jury," could well have been understood by defendants' counsel as meaning not merely that renewal of the motion at the close of the evidence would not be necessary but that it would not be entertained. The failure of plaintiff's counsel to object to consideration of the post-verdict motion because of the lack of a motion for a directed verdict at the close of the case may indicate that he too understood the judge's ruling that way at the time. On the other hand, we cannot say that the second branch of the Moore formulation was met. However, we think that when the first branch has been met, the test for excusing failure to move for a directed verdict at the end of the case, at

A motion for judgment notwithstanding the verdict will not lie unless it was preceded by a motion for a directed verdict made at the close of all the evidence.

The commentators and the case law are at one to that effect. See 9 Wright & Miller, *supra*, § 2537, at 596 and cases cited in n. 31 (1971); 5A Moore, *supra*, ¶ 50.08, at 50–85, and cases cited in n. 1.

least in a case where no objection was made to the court's entertaining the post-verdict motion, should not be whether the evidence following the party's unrenewed motion was "brief and inconsequential" but instead whether it was of such a character that the opposing party (here Ebker) could reasonably have thought that the moving party's initial view of the insufficiency of the evidence had been overcome and there was no need to produce anything more in order to avoid the risk of judgment n.o.v. As said in *Moran, supra,* 484 F.2d at 1012:

> [I]f on analysis the additional evidence, even though extensive, accomplishes what the defendant intended it should, i.e., strengthening his case without simultaneously exposing a flaw, little justification would seem to exist for finding significance in the quantitative aspect where the trial judge has reserved ruling on the first motion until after all evidence has been put in, and, at the time of the ruling, the evidence and issues are no weaker from the viewpoint of the movant than those which would have been presented had the second motion been filed.

This was the case here. Nygard's testimony in no way added to Ebker's case; on the contrary, it seriously detracted from it. This modification of the Moore formulation is consistent with the treatise's explanation of the reason "for establishing the motion for directed verdict as a condition precedent to a motion for judgment n.o.v.", namely, "to avoid making a trap of the latter motion," 5A Moore, *supra,* ¶ 50.08, at 50–88,[14] which we approved in *Oliveras v. American Export Isbrandtsen Lines, Inc.,* 431 F.2d 814, 816–17 (2 Cir.1970).[15]

However, we are still not out of the procedural morass. Although under our reformulation of the Moore standard the court, under the circumstances of this case, could properly entertain defendants' post-verdict motion despite the failure to renew the motion for a directed verdict at the close of the case, the post-verdict motion "cannot assert a ground that was not included in the motion for a directed verdict." 9 Wright & Miller, *supra,* § 2537, at 598 & n. 37 and cases there cited. Here, the motion, as initially made, was limited to two grounds. The first, based on Ebker's admission that her partnership. was not with Tan Jay, has been rendered academic by the verdict that there was no partnership between them. The second was the lack of evidence with respect to the con-

**14.** The treatise elaborates:

> At the time that a motion for directed verdict is permitted, it remains possible for the party against whom the motion is directed to cure the defects in proof that might otherwise preclude him from taking the case to the jury. A motion for judgment n.o.v., without prior notice of alleged deficiencies of proof, comes too late for the possibility of cure except by way of a complete new trial. The requirement of the motion for directed verdict is thus in keeping with the spirit of the rules to avoid tactical victories at the expense of substantive interests.

5A Moore's, *supra,* ¶ 50.08, at 50–88.

> When we refer to the Moore treatise's "explanation", we mean only that it is the best explanation available for the requirement in Rule 50(b) that a defendant must move for a directed verdict at the close of the case in order to preserve his right to move for judgment n.o.v. We see no basis in principle why a defendant should not be allowed to have the case submitted to the jury, which he may well desire for the reason stated in note 15 *infra,* and then move for judgment notwithstanding an adverse verdict so long as he has timely apprised the plaintiff that he challenges the sufficiency of the evidence to support a plaintiff's verdict and the court has permitted that issue to be reserved.

**15.** In saying this we recognize that in many cases the failure of a defendant's counsel to renew the motion at the close of the case may be not an inadvertence but a preference for what is deemed a probable jury verdict in favor of the defendant rather than a directed verdict with the inherent risk that such a verdict may be overturned by an appellate court—a dilemma that could be avoided if trial courts consistently adhere, as Judge Lowe apparently meant to do here, to the advice that "it is best for the trial judge to take a verdict, and then to pass on the sufficiency of the evidence on a post-verdict motion (*i.e.,* a motion for judgment, n.o.v.)." *Mattivi v. South African Marine Corp.* "*Huguenot*", 618 F.2d 163, 166 n. 2 (2 Cir.1980). But even when the failure is deliberate, we do not see how plaintiff is prejudiced by the defendant's failure to renew a motion for a directed verdict at the close of the case, except in the rather rare circumstances depicted in the *Moran* opinion, *supra,* 484 F.2d at 1012.

tract's term. If matters had not gone further, that would be the only ground on which the court could properly have granted judgment n.o.v. However, in the subsequent colloquy, other grounds were developed, most notably that of the "presumption" that Nygard was acting in his official capacity, which formed the basis of the court's setting aside the verdict on the first question.

## B. *Correctness of the ruling*

■ The standard for determining the correctness of the judge's grant of judgment n.o.v. is, as stated in *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970), "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." [16] Applying this standard we think the judge erred in setting aside the verdict that Ebker had entered into a joint venture with Nygard.

The main issue put to the jury was whether, as Ebker claimed, she had entered into a joint venture of any kind, or had become a mere employee, as Nygard claimed. On that basic issue the jury chose to credit Ebker and discredit Nygard. Even allowing for the fact that Ebker was hard pressed by time and despite the rather equivocal advertisements, the jury was not obliged to credit Nygard's testimony that Ebker, a leading figure in the women's clothing industry who had been earning $152,500 a year, would have been willing to contribute her name as well as her work solely for a maximum salary and bonus of $50,000—the same amount being earned by some of her subordinates. The jury manifestly chose to believe Ebker rather than Nygard, and the judge did not question that it had every right to do this.

Except for the reference to the supposed presumption, the jury had received no meaningful instruction on how, once it found a joint venture, it should determine whether the venture was with Nygard or with Tan Jay. After having decided that there was a joint venture, it encountered the first question, whether Ebker had entered into a joint venture with Nygard. Having decided that there was a joint venture, the jury not unnaturally answered "Yes" to the question whether it was between two human beings. With that out of the way and Ebker's victory thus seemingly assured, it was equally natural for the jury to have answered "No" to the question whether there was a joint venture between Ebker and a corporation—a concept which, though intelligible to lawyers, must be difficult for others to understand, at least without explanation.

■ The judge's main, indeed sole, reason for interfering with the jury's verdict on the first question was the "presumption" brought to her attention by defendant's counsel. We do not find it at all clear that the New York courts would apply any such "presumption" to the facts here at issue. [17] The presumption language ap-

---

**16.** For a more elaborate statement of the standard, see *Mattivi v. South African Marine Corp., "Huguenot", supra,* 618 F.2d at 167–68:

[W]hen deciding whether to grant a judgment n.o.v., the trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. Rather, after viewing the evidence in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences), the trial court should grant a judgment n.o.v. only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

See also 9 Wright & Miller, *supra,* § 2524, at 541–47. The test is the same whether the motion is for a directed verdict or for judgment n.o.v., *id.* at 541–42, citing cases.

**17.** Although Ebker's counsel chose not to take exception to the instruction with respect to the presumption, his inaction does not render the instruction the "law of the case" for purposes of appellate review of the entry of judgment n.o.v. See 9 Wright & Miller, *supra,* § 2558, at 670–71 ("Many decisions say that an instruction not objected to becomes the law of the case. This may be merely one way of phrasing the general

pears in *Hall v. Lauderdale*, 46 N.Y. 70, 74 (1871), where Judge Andrews said that in the case of oral agreements, "the presumption is that [so long as he is acting within the scope of his authority] the agent intends to bind the principal, and not himself." However, this language was used to repel an attempt by a third party to fasten liability on an agent for a disclosed principal[18] and the "presumption" is in effect nothing more than the established rule that "[u]nless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." Restatement (Second) of Agency, § 320 (1958). However, this leaves open the question whether the person is or is not acting or purporting to act as an agent. As to this, the plaintiff satisfies his initial burden by proving that "the defendant has made a promise, the form of which does not indicate that it was given as agent." *Id.* comment b. The defendant "then has the burden of going forward if he wishes to show that his promise was made only as an agent and that this should have been so understood"; although in the case of oral agreements, the agent "satisfies the burden of going forward by showing that it was known to the other that he was acting as agent for a disclosed principal and, unless further facts are shown, a judgment for the agent should be directed," *id.* Here the question whether Nygard purported to be acting for himself or on behalf of Tan Jay was disputed. Ebker satisfied her initial burden under the rule of the Restatement and there was little evidence that Nygard ever made it clear to Ebker that he was acting solely on behalf of Tan Jay. Beyond this, we have been cited to no New York decision holding that the "pre-

sumption" extends to a case which is not one of ordinary contract but rather of corporate opportunity, where the third party asserts that the agent availed himself of an opportunity involving the prospect of substantial gain, especially when, as was the situation here, there was evidence that the agent gave the third person reason to believe that he regarded the principal and himself as one and the same.

Even if the New York courts could apply a "presumption" to a case such as this, it is altogether unclear how much weight they would give it, see Fed.R.Evid. 302. As said in Fisch, New York Evidence § 1192, at 667–68 (2d ed. 1977):

> By varying the procedural consequences with the reasons underlying the creation of the presumption, our courts have avoided the irrational results that accompany adoption of the "one-rule theory." Unhappily, however, by their haphazard and careless use of language, our judiciary has created tremendous confusion. It has been declared that a presumption disappears in the presence of substantial evidence to the contrary, that it can be rebutted only by evidence that the jury believes, that it is not overcome except by very convincing evidence, that it vanishes if the opponent offers proof to the contrary. Some cases give the impression that a different rule applies for each presumption; others that the rule applied in the case stating the proposition is the rule for all presumptions.

(footnotes omitted) We feel no obligation, in the absence of any help from the parties, to venture into this bog. Apart from the "presumption" Ebker had the burden of establishing by a preponderance of the evidence that she entered into a joint venture

---

principle that failure to object ordinarily bars later challenge to an instruction. It appears to have no meaning beyond that.") (footnotes omitted). Rather, we must review the district judge's order in light of the "applicable law which is controlling, and not what the trial court announces the law to be in [its] instructions", *Coca Cola Bottling Co. v. Hubbard*, 203 F.2d 859, 862 (8 Cir.1953). See *Hanson v. Ford Motor Co.*, 278 F.2d 586, 592–93 (8 Cir.1960) (Blackmun, J.); *Johnson v. United States*, 434

F.2d 340, 343 (8 Cir.1970); 9 Wright & Miller, *supra*, § 2537, at 599–600.

**18.** The other cases cited in defendants' trial memorandum, *John Minder & Son v. L.D. Schreiber Co.*, 73 F.Supp. 477 (S.D.N.Y.1947); *Salzman Sign Co. v. Beck,* 10 N.Y.2d 63, 217 N.Y.S.2d 55, 176 N.E.2d 74 (1961), are even less in point.

with Nygard; we have been cited to no New York cases that would tell us how much more evidence she needed to overcome the "presumption", if presumption there was.

■ Presumption or no presumption, plaintiff's evidence was sufficient for a reasonable jury to find that the joint venture was between herself and Nygard rather than between herself and Tan Jay. She had testified expressly to that effect, see *supra* note 8. Nygard's testimony was not that any joint venture was with Tan Jay but that there was no joint venture at all. A reasonable jury could think that when a man and a woman drink a toast to their "partnership", even in a business sense, an episode testified to by Ebker and Dean and not denied by Nygard or either of the two Tan Jay employees who were present but were not called, they are toasting a relationship between themselves rather than one between the woman and a corporation. So also with respect to the reference to a partnership in the altercation of February 13, 1979, again testified to by Ebker and Dean and not denied by Nygard. There was also Ebker's testimony that Nygard was to receive a salary from the venture, in addition to his regular compensation from Tan Jay. Admittedly there was evidence pointing the other way. The choice of what inference to draw from these conflicting pieces of evidence was for the jury. If it was satisfied that the joint venture, the existence of which it permissibly found to have been established, was with Nygard rather than with his company, there was enough evidence to support this.

Defendants assert that reinstatement of the verdict will do Ebker no good because

the jury must also have found, in accordance with the judge's instruction, that the venture was for a term of five years and thus was void under the New York statute of frauds. Despite some sweeping pronouncements to the effect that the New York statute of frauds, N.Y.Gen.Oblig.Law § 5–701(a)(1), does not apply to joint ventures, these must mean only that a writing is not required simply because the transaction is a joint venture, and the statute must apply to joint ventures having a stated term of more than one year, as the plain language of § 5–701(a) of the New York General Obligations Law, *supra* note 3, dictates. *Wahl v. Barnum*, 116 N.Y. 87, 97, 22 N.E. 280 (1889), held that a "contract forming a partnership to be continued beyond one year, is within ... the statute of frauds." *Accord, Backus Plywood Corp. v. Commercial Decal, Inc.*, 317 F.2d 339, 341–42 (2 Cir.1963); *Chromalloy American Corp. v. Universal Housing Systems*, 495 F.Supp. 544, 550–51 (S.D.N.Y.1980), *aff'd mem.*, 697 F.2d 289 (2 Cir.1982); *cf. Yonofsky v. Wernick*, 362 F.Supp. 1005, 1026 (S.D.N.Y.1973) ("the inapplicability of the statute of frauds to joint venture agreements does not protect transactions ... that are otherwise subject to the statute"). We perceive no difference relevant for the purpose of the statute of frauds between joint ventures for a stated term and partnerships for a stated term. The statements that the New York statute of frauds does not apply to joint ventures doubtless arise from the fact that joint ventures are usually not for a stated term but for a stated purpose, and the implicit assumption that, however unlikely, this purpose could be achieved within one year.[19]

19. We accept that if Ebker had testified to a joint venture that would continue until the "Nancy Ebker Company" had achieved a particular level of profitability, at which time the venture would be sold, or until the time was ripe for it to go public, this would avoid the barrier of § 5–701(a)(1) of the New York General Obligations Law, since in theory, however unlikely in fact, the level could have been reached within a year. See, *e.g.,* *Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 401 N.Y. S.2d 176, 180, 372 N.E.2d 12, 15 (1977) (Breitel,

C.J.) ("It matters not, however, that it was unlikely or improbable that [a venture] would be [performed] within one year. The critical test, instead, is whether 'by its terms' the agreement is not to be performed within a year."); *Shirley Polykoff Advertising, Inc. v. Houbigant, Inc.*, 43 N.Y.2d 921, 922, 403 N.Y.S.2d 732, 733, 374 N.E.2d 625, 626 (1978) ("If [a contract by its terms can be performed within one year] it would be without the statute even if, as a practical matter, it were well nigh impossible of performance within a year...."); *Pace v. Perk*, 81

■ Accordingly, the statute of frauds renders unenforceable the oral joint venture agreement containing a stated term of five years as found by the jury. See, *e.g.*, *Pace v. Perk*, 81 A.D.2d 444, 457–58, 440 N.Y.S.2d 710, 718 (1981) ("Where a parol agreement is, by its express terms, for a period exceeding one year it is unenforceable."). Nevertheless, as the district judge pointed out during the pretrial conference, this consequence does not terminate Ebker's action. Both Ebker and Nygard had commenced performance of their obligations under the joint venture agreement. Thus,

> the only effect of the statute [of frauds], where the [joint venture] agreement has been wholly or partially executed, is to convert it into a partnership at will, wherein a partner may bring an action in equity to call his copartner to account.

*Green v. LeBeau*, 281 A.D. 836, 836, 118 N.Y.S.2d 585, 586–87 (1953); *accord, Sanger v. French*, 157 N.Y. 213, 234, 51 N.E. 979 (1898); *cf., McCall v. Frampton*, 99 Misc.2d 159, 170–71, 415 N.Y.S.2d 752, 760 (Sup.Ct.1979), *modified on other grounds*, 81 A.D.2d 607, 438 N.Y.S.2d 11 (1981). Although Nygard has argued, both to the district court and to us, that the only remedy available to Ebker as a joint venturer "at will" is an accounting, see N.Y. Partnership Law § 74, the district judge never resolved the issue of what remedies Ebker might have and we think it best to defer ruling on the issue. We note only that the answer is far from clear, *compare Bassett v. American Meter Co.*, 20 A.D.2d 956, 249 N.Y.S.2d 815 (1964) *and Hooker Chemicals & Plastics Corp. v. International Minerals & Chemical Corp.*, 90 A.D.2d

991, 456 N.Y.S.2d 587 (1982) *with Crownshield Trading Corp. v. Earle*, 200 A.D. 10, 192 N.Y.S. 304 (1922) *and LaFleur v. Montgomery*, 70 A.D.2d 545, 416 N.Y.S.2d 602 (1979), and that even an accounting must make some ruling with respect to the ownership of the Nancy Ebker name.

In summary, we hold that the district judge erroneously granted judgment n.o.v. to Nygard and accordingly remand the case to the judge with instructions to reinstate the jury's verdict on the first question and to conduct appropriate further proceedings with respect to Ebker's complaint. In light of this, we must vacate the judgment entered in Tan Jay's favor on its counterclaim because the trial of the counterclaim had proceeded on the assumption that Ebker was an employee of Tan Jay, not a joint venturer of Nygard, and remand that portion of the case for a new trial. Our order requiring a new trial on Tan Jay's counterclaim on an assumption more favorable to Ebker also renders it unnecessary for us to decide whether the district judge properly declined to permit the jury to award punitive damages to Tan Jay, and we therefore dismiss the cross-appeal without prejudice. No costs.

---

A.D.2d 444, 457, 440 N.Y.S.2d 710, 718 (1981) ("where performance is possible, however unlikely or improbable that may be, within one year, the agreement does not come within the proscription of the statute...."). Ebker, however, stressed that she and Nygard had agreed to be joint venturers for five years, her counsel consistently urged this despite the judge's warning of the danger, the case was submitted to the

jury on that basis without objection on his part, and the jury must be deemed to have made the finding that the judge required. Our ruling in this respect is not inconsistent with our holding that the instruction with regard to the "presumption" is not the law of the case. Here plaintiff's trial counsel himself consistently espoused the proposition that the joint venture was for a five year term.